Cathy BREHANY, Plaintiff
and Appellee,

v.

NORDSTROM, INC., et al., Defendant,
Appellant, and Cross–Appellee.

Dennis KNAPP and Barbara Knapp,
his wife, Plaintiffs, Appellees, and
Cross–Appellants,

v.

NORDSTROM, INC., et al., Defendant,
Appellant, and Cross–Appellee.

No. 20590.

Supreme Court of Utah.

May 16, 1991.

50

Max D. Wheeler, Stephen J. Hill, Stanley J. Preston, Salt Lake City, for Nordstrom, Inc.

D. Gilbert Athay, Salt Lake City, for Brehany and the Knapps.

STEWART, Justice:

Nordstrom, Inc., the defendant in the above consolidated cases, appeals a judgment for $285,000 in favor of Cathy Brehany, Dennis Knapp, and Barbara Knapp for wrongful termination of employment based on breach of an implied-in-law covenant of good faith and fair dealing. The plaintiffs cross-appeal from the trial court's dismissal of their claims for breach of contract and defamation.

## I. FACTS

Nordstrom, a regional retail department store, employed plaintiffs Dennis Knapp, Barbara Knapp, and Cathy Brehany at its Crossroads Plaza store in Salt Lake City. Dennis Knapp was hired by Nordstrom in July 1973. After managing a Nordstrom store in California, he became Nordstrom's first general manager in Utah, where he was responsible for staffing the Salt Lake City Crossroads Plaza store with purchasing agents and managers. Barbara Knapp, Dennis Knapp's wife, was hired first by Nordstrom in October 1975 and was a women's fashion buyer for the Salt Lake City store. Plaintiff Cathy Brehany also began working for Nordstrom in southern California. She was later transferred to the Crossroads Plaza store where she worked as a buyer. All three were hired for indefinite terms.

After being hired, each plaintiff received a company employee manual entitled *Nordstrom History, Policy & Regulations* and signed the following statement at the end of the manual: "I have read and understand the preceding pages of the Nordstrom Policy and Regulation manual. I understand that my continued employment is contingent upon my adhering to the Policies stated therein." The manual explains employment benefits, policies, and privileges and sets forth standards and rules of conduct for employees, the breach of which would justify discharge. Under the manual, written warning was to be given an employee for nine separate offenses that would justify termination of employment. The manual also set forth another eleven offenses that could result in immediate discharge without written warning. Among the latter offenses are the following:

5. Unbecoming conduct bringing reflection or criticism upon the store and its personnel, malicious mischief, neglect or carelessness resulting in injury to individuals or destruction of store or other property.

. . . .

7. [T]he violation of any criminal law or conviction in any court of criminal law while in our employ.

8. Introduction, possession, or use of habit-forming drugs, hallucinogens, illegal narcotics, or intoxicating liquors on the property of the store or reporting for duty under the influence of the same. This includes use or consumption during breaks, lunch, or prior to reporting for work.

Nordstrom's stated objective in promulgating these rules was "to maintain harmony and prevent injustice," and to this end, the rules were to be "strictly enforced in fairness to the group as a whole."

During an internal Nordstrom investigation of drug use among its southern California employees, the corporate security officer learned of reports that two employees who were then working for Nordstrom in Utah had used drugs and had attended parties where drugs were used. Further inquiry disclosed additional information that there was drug use among company employees in Utah and that Dennis and Barbara Knapp and Michael Soule were implicated in using illegal drugs while on company business. A report to management indicated that Cathy Brehany had used drugs, although not while on company business—and not so as to be "high" when she went to work, and attended parties of company employees where drugs were used, but denied using drugs with any co-workers outside of work. The company report also indicated that someone had said that Brehany had a source for drugs. The information from the investigation was gathered from two sources and given to John Nordstrom, co-chairman of the board of directors. Management also sought and obtained from two additional sources confirmation of this information. James Nordstrom, president of Nordstrom, then traveled to Salt Lake City from company headquarters in Seattle, Washington, and terminated the employment of the three plaintiffs and Michael Soule without prior written warning. Dennis Knapp was told that he was fired for using drugs; Barbara Knapp was told she was fired because she was Dennis Knapp's wife; and Cathy Brehany was told she was fired for supplying drugs to employees.

At trial, Dennis Knapp admitted using cocaine and marijuana in the presence of vendors while representing Nordstrom on buying trips. He also testified that James Nordstrom told him he was fired because he had used illegal drugs and had used poor judgment in bringing employees to Salt Lake City who he knew had drug problems. Barbara Knapp also admitted at trial using marijuana in the presence of other employees and while on buying trips in the presence of vendors. She testified, however, that she was told she was terminated because she was Dennis Knapp's wife. Cathy Brehany denied using or selling drugs, but admitted associating with others who used illegal drugs. She testified that James Nordstrom told her she was terminated because of reports that she had been supplying drugs to employees. The day after the terminations, James Nordstrom stated in a meeting of managers and buyers from the Salt Lake City store that the termination of Dennis Knapp was drug-related. Cathy Brehany had not at that time been discharged. The next day, the new manager of the Salt Lake store told a meeting of buyers and managers that drug use would not be tolerated and that if anyone had a drug problem, he or she should resign.

Dennis and Barbara Knapp and Cathy Brehany filed complaints alleging claims for (1) wrongful discharge, (2) breach of the contract of employment, (3) intentional infliction of emotional distress, and (4) defamation. Before trial, the trial court dismissed the plaintiffs' claims for wrongful discharge and intentional infliction of emotional distress for failure to state claims upon which relief could be granted. The plaintiffs have not appealed the dismissal of those claims.

At the close of all evidence, the trial court granted Nordstrom's motion for a directed verdict as to the plaintiffs' defamation claims on the ground that the defamatory statements published to company managers and buyers in the Salt Lake store by James Nordstrom were privileged communications. The court also ruled as a matter of law that since the plaintiffs' employment contracts were for indefinite

terms, they were at-will employees and had no valid claim for breach of contract based on the termination of their employment.

Nevertheless, the trial court instructed the jury that the law recognizes an implied "right of good faith dealing which is protected in the courts" and that the plaintiffs could recover damages if Nordstrom breached the implied covenant of "good faith dealing." The trial court did not, however, define the term "good faith" in its instructions to the jury. The jury returned special verdicts finding that Nordstrom had terminated the plaintiffs' employment in "bad faith" and awarding Dennis Knapp $150,000, Barbara Knapp $80,000, and Cathy Brehany $55,000. The trial court thereafter denied Nordstrom's motions for a new trial, judgment notwithstanding the verdict, and a remittitur.

On this appeal, Nordstrom contends that (1) the trial court erred in instructing the jury that an employer's right to terminate employees hired under indefinite-term employment contracts is limited by an implied-in-law covenant of good faith and fair dealing; (2) there was insufficient evidence to justify the jury's verdict that the plaintiffs were fired in bad faith; (3) the trial court failed to instruct the jury on the meaning of the terms good faith and bad faith; (4) the issue of bad faith termination should not have been submitted to the jury because it was neither raised in the pleadings nor tried; (5) the instructions on damages were in error; and (6) the evidence of damages was insufficient to support the jury's award. The plaintiffs cross-appeal on the ground that the trial court erred in dismissing their claims for defamation and wrongful termination based on provisions contained in Nordstrom's employee manual.

## II. WRONGFUL DISCHARGE AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

We first address Nordstrom's contention that the trial court erred in instructing the jury that it could find for the plaintiffs based on a breach of an implied covenant of "good faith dealing" in the context of an indefinite-term employment contract.

Closely related to that issue is the plaintiffs' cross-appeal urging error in the trial court's dismissal of their claims for breach of implied contract terms based on the provisions in the Nordstrom employee manual. We conclude that (1) Nordstrom is correct in contending that the trial court erred in holding that Utah law recognizes a claim for relief for wrongful discharge based on breach of an implied-in-law covenant of good faith and fair dealing; and (2) the plaintiffs are correct in arguing that the court also erred in not instructing the jury that provisions in the Nordstrom employee manual could be found to limit the right of an employer to discharge an indefinite-term employee. Nevertheless, for reasons explained below, we hold that the latter error was harmless as to Dennis and Barbara Knapp. Because of our ruling on the covenant of good faith and fair dealing, it is not necessary to address the other five issues raised by Nordstrom. We also affirm the trial court's dismissal of the plaintiffs' defamation claims.

Nordstrom contends that because the plaintiffs were hired for indefinite terms, they were at-will employees under established Utah law and could be fired for any or no reason. Although the at-will rule has been recognized and applied in numerous older cases, it has become identified in recent times with the case of *Bihlmaier v. Carson*, 603 P.2d 790 (Utah 1979). *Bihlmaier* reiterated the general rule:

> The general rule concerning personal employment contracts is, in the absence of some further express or implied stipulation as to the duration of the employment or of a good consideration in addition to the services contracted to be rendered, the contract is no more than an indefinite general hiring which is terminable at the will of either party....
>
> When an individual is hired for an indefinite term, he has no right of action against his employer for breach of the employment contract upon being discharged.

603 P.2d at 792 (footnotes omitted). *Accord Crane Co. v. Dahle*, 576 P.2d 870 (Utah 1978); *Held v. American Linen*

*Supply Co.*, 6 Utah 2d 106, 307 P.2d 210 (1957). *See also Amos v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints*, 594 F.Supp. 791, 829 (D.Utah 1984), *rev'd*, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). After *Bihlmaier* was decided, *Rose v. Allied Development Co.*, 719 P.2d 83 (Utah 1986), expanded the *Bihlmaier* doctrine and held that a limitation on an employer's absolute right to discharge an employee hired under an indefinite term employment contract had to be supported either by an agreement of the parties or by consideration beyond the rendering of services under the employment contract.

After *Rose*, this Court modified the at-will doctrine as it had been applied. *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044–45 (Utah 1989), held that the presumption of an at-will discharge right created by an indefinite term employment agreement could be modified by implied-in-fact contract terms found in an employment manual and that an employee's continued performance of services could be adequate consideration for those terms.

The lead opinion in *Berube*, written by Justice Durham and concurred in by the author of this opinion, surveyed the the doctrines that have developed in other jurisdictions that limit the absolute and arbitrary right of employers to discharge indefinite-term employees. That opinion identified three general exceptions to the terminable-at-will doctrine developed in other states. 771 P.2d at 1041–42. First, a number of courts have held that an employer may not terminate an indefinite-term employment contract for motivations that contravene public policy. 771 P.2d at 1042–43. Second, a number of courts have held that employment manuals and company policy statements concerning the terms of employment may provide terms that limit an

employer's absolute right to discharge for any or no reason. 771 P.2d at 1044–46. Third, a few states have held that an indefinite-term employment contract is subject to an implied-in-law covenant of good faith and fair dealing that makes an employer liable for a bad faith discharge. 771 P.2d at 1046–47.

Justice Zimmerman filed a separate opinion concurring in portions of Justice Durham's opinion, 771 P.2d at 1050–53, and Justice Howe, joined by Chief Justice Hall, did the same. 771 P.2d at 1050. In sum, Justices Durham, Stewart, and Zimmerman agreed that an indefinite-term employment contract creates a rebuttable presumption that the employment is on an at-will basis. 771 P.2d at 1044, 1051. The same three justices concurred in the proposition that employment manual provisions may constitute implied-in-fact terms of the employment arrangement, even without additional consideration, that restrict the absolute right of an employer to terminate the employment of an indefinite-term employee.[1] 771 P.2d at 1045, 1051.

*Lowe v. Sorenson Research Co. Inc.*, 779 P.2d 668, 670 (Utah 1989), and *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483, 485 (Utah 1989), followed *Berube* and held that an employer's policy statements in the form of bulletins, as well as an employment manual, could rebut the presumption of an at-will employment relationship and establish additional terms of the employment contract that limited an employer's right of discharge. *Caldwell* also squarely ruled that although "the terms of the manual were not made known to the employee before hiring," they could still be found to rebut the at-will presumption and to constitute the terms of an agreement. 777 P.2d at 485. However, because the employer's policy statements in *Caldwell*

---

**1.** Justice Howe's concurring opinion in *Berube* stated that "it is not necessary or appropriate here to go beyond the written policy manual of the employer" and that the case should be remanded for a determination of whether the discharge violated the employer's policy manual. 771 P.2d at 1050. Justice Howe did not, however, indicate that additional consideration beyond the performance of future services was

required to limit the employer's right of termination. Implicit in the position taken by Justices Durham, Stewart, and Zimmerman was the view that future services constituted sufficient consideration for the additional terms. *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483 (Utah 1989), put to rest any question regarding the law on that point.

did not purport to establish limitations on the employer's right to discharge, the employer's discharge of the employee did not, as a matter of law, breach the employment contract. 777 P.2d at 486. Subsequently, in *Loose v. Nature–All Corp.*, 785 P.2d 1096, 1097–98 (Utah 1989), the Court refused to recognize an implied-in-law covenant of good faith and fair dealing that would limit an employer's right to discharge indefinite-term employees to instances in which the employer could show good cause.

■ Here, the plaintiffs correctly observe that every contract is subject to an implied covenant of good faith. For example, in *Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985), the Court, in referring to the implied covenant of good faith, stated that, "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract." *See also Beck v. Farmer's Ins. Exch.*, 701 P.2d 795, 797–98 (Utah 1985). From that premise, the plaintiffs argue that an employer may discharge an indefinite-term employee only if the employer can show that the discharge is made in good faith, meaning, specifically, that the employer has good cause for the discharge.

■ The purpose and function of the implied covenant of good faith generally recognized in all contracts is different from the purpose and function of the so-called covenant of good faith and fair dealing in employment contracts. Under the implied covenant of good faith applied in *Resource Management*, the parties to a contract are deemed to intend that the terms of a contract should be construed in a manner which assumes the parties intended that the duties and rights created by the contract should be performed and exercised in good faith. Such a covenant cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties. Nor can a covenant of good faith be used to nullify a right granted by a contract to one of the parties or to require a party vested with a contract right to

exercise that right in a manner contrary to that party's legitimate self-interest. *See Rio Algom Corp. v. JIMCO Ltd.*, 618 P.2d 497, 505 (Utah 1980).

■ The covenant of good faith recognized in *Resource Management* cannot be construed to change an indefinite-term, at-will employment contract into a contract that requires an employer to have good cause to justify a discharge. Ordinarily the at-will doctrine is not made a substantive term of an employment contract which the parties specifically agree to. Absent such an explicit term, an indefinite-term employment contract raises only a presumption that the employment is at-will, as *Berube* held. Of course the at-will doctrine may be altered by terms contained in an employment manual. *Berube*, 771 P.2d at 1045; *see also Leikvold v. Valley View Community Hosp.*, 141 Ariz. 544, 546, 688 P.2d 170, 172 (1984); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 597–99, 292 N.W.2d 880, 884–85 (1980). However, in the absence of express terms limiting the right of an employer to discharge for any or no reason and in the absence of provisions establishing procedures by which a discharge should be effectuated, it would be inconsistent to hold that an employer, on the basis of the implied covenant of good faith, is bound to a substantive limitation on the employer's right to discharge. *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 304–05, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983), states that proposition in the following language:

No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship. Thus, in the case now before us, plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. In the context of such an employment it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination. The parties may by express agreement

**56**

limit or restrict the employer's right of discharge, but to imply such a limitation from the existence of an unrestricted right would be internally inconsistent.

In sum, the trial court erred in instructing the jury that it could find for the plaintiffs on the basis of a breach of an implied-in-law covenant of good faith and fair dealing.

■ The trial court also erred in failing to recognize the validity of the plaintiffs' theory that the terms of an employment manual can rebut the inference of an at-will right to discharge. The plaintiffs tried the case on the theory that certain terms in Nordstrom's employee policy manual dealing with the termination of employees were implied terms of the contract of employment and limited Nordstrom's right to discharge. Under *Berube, Lowe, Caldwell,* and *Loose,* the plaintiffs could recover if they proved that proposition and a breach of the terms of the manual purportedly limiting the right to discharge. The plaintiffs must therefore establish two propositions. First, do any of the provisions in the manual purport to limit or modify Nordstrom's unfettered right to discharge its employees? If so, did Nordstrom violate any of those provisions?

■ If the terms of the manual do purport to limit Nordstrom's power to discharge, the question of whether they become implied terms of the contract of employment is primarily a factual issue. *Lowe v. Sorensen Research Co.,* 779 P.2d 668, 670 (Utah 1989). The evidence that is relevant to that determination includes the language of the manual itself, the employer's course of conduct, and pertinent oral representations. *Leikvold v. Valley View Community Hosp.,* 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984). Ordinarily, the proper construction of contractual terms in the first instance raises an issue of law to be decided by a court, unless the contract terms are ambiguous and raise factual is-

sues. *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483, 486 (Utah 1989). Thus, when it is plain that a manual or bulletin does not limit the right to discharge at will, the case need not go to a jury. 777 P.2d at 486.

■ Here there are arguable issues as to just what the terms of the manual were intended to accomplish. The manual sets forth a number of different types of conduct that may result in discharge. The manual, under the heading "Regulations Protecting You and Your Store," sets out nine categories of conduct which "may result in discharge after a written warning." However, the manual also sets out another eleven categories of conduct which "may result in immediate dismissal" without prior written notice or warning. Although the rules seem to limit Nordstrom's right to discharge without prior warning to the categories listed, there is an inherent ambiguity in the rules. Viewing both categories together, a legitimate issue arises as to whether all the offenses listed are intended to constitute the exclusive grounds for discharge. If not, a factual issue may exist regarding Nordstrom's course of conduct in construing its rules. In any event, the manual purports to have some binding effect with respect to employees. They were required to sign the manual, and they were informed that their continued employment depended on their adherence to its terms.[2]

■ Nevertheless, the issue as to Dennis and Barbara Knapp may be disposed of as a matter of law because of admitted facts and our assumption (in their favor) that the manual does restrict Nordstrom's right to discharge for any or no reason. The manual stated that the continued employment of the employees was consideration for their signing the manual. The manual provides that an employee may be immediately discharged, without prior notice for "introduction, possession, or use of habit-forming drugs, hallucinogens, illegal

---

**2.** To the extent that the terms in the manual become part of the employment contract, they are terms of a unilateral contract. *Hoffman–LaRoche Inc. v. Campbell,* 512 So.2d 725, 734–38 (Ala.1987). The continued rendering of services by an employee is therefore consideration that supports the binding effect of the terms. The employer may, however, change those terms or even abolish them. *See Hoffman–LaRoche,* 512 So.2d at 735.

narcotics, or intoxicating liquors on the property of the store" or for "violation of any criminal law or conviction in any court of criminal law while in our employ." Both Dennis and Barbara Knapp admitted at trial that they had used drugs while on buying trips for Nordstrom. Clearly, their admitted use of narcotics justified summary dismissal under the terms of paragraph 8 of the manual. Their use of drugs was directly prohibited and also constituted a crime.

■■■ Whether Cathy Brehany committed an act which subjected her to immediate discharge without warning is problematic. It is not clear which provision or provisions, if any, in the manual might have provided a basis for her discharge. Although she allegedly associated with other employees who used drugs, no evidence demonstrated that she used drugs. Whether she arranged a sale of drugs and was therefore guilty of a technical violation of the law is a factual issue. Thus, on remand the trial court must determine which provisions, if any, apply to her, what conduct provided a basis for her discharge, and whether she was arguably entitled to a prior written warning before discharge.

Possibly Nordstrom's rules dealing with dismissal with or without prior written warning, were intended to be the only grounds justifying dismissal. If that is the case, Brehany may have been unjustifiably discharged or may have been entitled to a warning. If, however, the rules are not found to be the only possible grounds for discharge, the rule in *Bihlmaier* might apply so that Brehany would be subject to the at-will doctrine. We do not foreclose the possibility that Nordstrom's rules could be subject to the interpretation that they are not exclusive. If they are not, the rules may nevertheless be found to be binding with respect to those types of conduct specifically described in the rules which permit a dismissal only with prior warning.

In short, with respect to Cathy Brehany triable factual issues exist as to whether the dismissal rules in the manual rebut the presumption of an at-will power to discharge, either in whole or in part. On remand, the trial court will have to determine which terms in the manual apply, if any, and if the rules are held applicable, whether Nordstrom violated them.

The judgment as to the Knapps must accordingly be reversed and judgment entered for Nordstrom on the breach of contract claim. As to Cathy Brehany's claim of breach of contract, the matter is remanded to the trial court for a new trial.

## III. DEFAMATION

The plaintiffs also assert that the trial court erred in dismissing the defamation claims based on statements made by James Nordstrom at a meeting of store managers and buyers indicating that the dismissals were for drug-related activities. Nordstrom asserts that the trial court's dismissal of the defamation claims was proper because the statements were (1) true and (2) protected by a qualified privilege that was not overcome by proof of malice.

On appeal, the standard we use to review a directed verdict granted at the close of evidence is whether reasonable minds would agree that no substantial evidence supported each element of a cause of action. *Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.,* 652 P.2d 896, 897–98 (Utah 1982). To that end, we examine the evidence in the light most favorable to the losing party. If there is a reasonable basis in the evidence that would support a verdict in favor of the losing party, the directed verdict cannot stand. *Graystone Pines,* 652 P.2d at 898. But a directed verdict is appropriate if, on uncontested facts and under the applicable law, one party is entitled to judgment.

■■■ In this state, truth is an absolute defense to an action for defamation. *See Auto West, Inc. v. Baggs,* 678 P.2d 286, 290 (Utah 1984); *Ogden Bus Lines v. KSL, Inc.,* 551 P.2d 222, 224 (Utah 1976); *Williams v. Standard–Examiner Publishing Co.,* 83 Utah 31, 59, 27 P.2d 1, 13 (1933); Utah Const. art. I, § 15. The defense of truth is sufficiently established if the defamatory charge is true in substance.

Insignificant inaccuracies of expression do not defeat the defense of truth. *Crellin v. Thomas*, 122 Utah 122, 127, 247 P.2d 264, 266 (1952). *See also Auto West*, 678 P.2d at 290–91.

■ Both Dennis and Barbara Knapp admitted at trial that they had used illegal drugs while employed by Nordstrom and while engaged in their employment duties. These admissions justified the trial court's dismissal of their defamation claims.

■ Cathy Brehany made no such admission, and the evidence relating to whether she had been involved with illicit drugs was, at best, conflicting. In substance, the evidence was that she introduced a person to another person who sold drugs. But whether the introduction was to facilitate a sale or was for a wholly innocuous purpose is unclear. In any event, we cannot hold as a matter of law that truth was a defense to Brehany's claim.

■ Nevertheless, her claim was still barred as a matter of law. The publication of a defamatory statement is conditionally or qualifiedly privileged in certain situations in which a defendant seeks to vindicate or further an interest "regarded as being sufficiently important to justify some latitude for making mistakes...." W. Keeton, *Prosser and Keeton on the Law of Torts* § 115, at 825 (5th ed. 1984). Whether a publication is conditionally privileged is a question of law to be determined by the trial court, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice.[3] *See Lind v. Lynch*, 665 P.2d 1276, 1278–79 (Utah 1983). *See also Combes v. Montgomery Ward & Co.*, 119 Utah 407, 412, 228 P.2d 272, 274–75 (1951). If a qualified privilege exists, the burden is on the plaintiff to prove that the privilege was abused.

*See Prosser* § 115, at 835. The plaintiff can show abuse of the privilege by proving that the defendant acted with malice or that the publication of the defamatory material extended beyond those who had a legally justified reason for receiving it.

■ Nordstrom argues that this case is governed by Utah Code Ann. § 45–2–3(3) (1988), which provides that a communication is privileged if made

> without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

Title 45 deals specifically with newspapers and radio broadcasting, and § 45–2–3(3) is therefore not technically applicable to this case,[4] but the privilege stated in § 45–2–3(3) is really a privilege recognized at common law and applies generally in defamation cases. *See* Utah Code Ann. § 76–9–506 (1990).

■ The law has long recognized that a publication is conditionally privileged if made to protect a legitimate interest of the publisher. *Combes*, 119 Utah at 413–15, 228 P.2d at 274–75; *Restatement (Second) of Torts* § 594 (1977). A conditional privilege may also protect a legitimate interest of either the recipient or a third person. *Restatement (Second) of Torts* § 595 (1977). The privilege also extends to statements made to advance a legitimate common interest between the publisher and the recipient of the publication. *Lind v. Lynch*, 665 P.2d 1276, 1278 (Utah 1983); *Restatement (Second) of Torts* § 596 (1977). This qualified privilege protects an employer's communication to employees and to other interested parties concerning the reasons for an employee's discharge. *See, e.g., Prosser* § 115, at 825–27; *Re-*

---

3. The malice required to rebut the qualified privilege of defamation law is distinct from the malice imputed in all defamatory statements. *See Combes v. Montgomery Ward & Co.*, 119 Utah 407, 415–17, 228 P.2d 272, 276–77 (1951); W. Keeton, *Prosser and Keeton on the Law of Torts* § 115, at 833–34 (5th ed. 1984).

4. Title 45 of Utah Code Annotated was considered in *Seegmiller v. KSL, Inc.*, 626 P.2d 968 (Utah 1981), and *Ogden Bus Lines v. KSL, Inc.*, 551 P.2d 222 (Utah 1976).

*statement (Second) of Torts* § 594 comment f (1977).

■ The plaintiffs have alleged that Nordstrom made defamatory statements in meetings with its managers and buyers. Put in the light most favorable to Brehany, the most that can be said or imputed is that Nordstrom made statements that the plaintiffs' terminations were related to drugs. The trial court ruled as a matter of law that those statements made only to its management-level employees were conditionally privileged. No error has been demonstrated in the trial court's conclusion. Clearly the trial court did not err in ruling that Nordstrom's statements to its management-level employees concerning the use of drugs were subject to a conditional privilege. Knowledge that Nordstrom intended to enforce its policy against the use of narcotics was important information for those employees because of its deterrent effect both upon them and the employees they managed, especially in view of the fact that drug usage may have been widespread and failure to communicate the enforcement policy could have been detrimental to the employment interests of others.

■ As noted, the plaintiffs had the burden of overcoming the privilege by proof of malice or excessive publication. With respect to the issue of malice, we note that Nordstrom mistakenly quotes *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 971 (Utah 1981), for the proposition that the malice the plaintiffs must prove is "a deliberate misrepresentation or a reckless disregard for the truth or falsity of a statement." However, *Seegmiller* concerned the burden of overcoming the qualified first amendment principle as it applies to public officials and public figures under the Supreme Court's ruling in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1975). The first amendment standard of malice serves a different purpose in defamation law than the common law standard of malice. In *Cox v. Hatch*, 761 P.2d 556, 559 n. 1 (Utah 1988), we stated:

[T]he term "actual malice," as used in *New York Times* and its progeny, has often been confused with the common law terms "malice" and "actual malice," which denote personal hostility or ill will. Although the common law term and the *New York Times* term use the same words, they denote different legal concepts.

■ Nordstrom argues that Brehany has waived the issue of malice by failing to allege malice in her amended complaint. The issue of malice is ordinarily a factual issue. *Lind v. Lynch*, 665 P.2d 1276, 1279 (Utah 1983). Regardless of the appropriate definition of malice, however, Brehany did not have to anticipate an affirmative defense in her complaint, and whether it should have been pleaded in a reply has not been addressed in the briefs.

■ In any event, the issue of malice simply was not properly presented to the trial court on Nordstrom's motion for a directed verdict on the issue of qualified privilege. Since Brehany failed to assert that there was a factual issue as to whether the privilege had been defeated, that issue has been waived.

In conclusion, the plaintiffs' judgments for breach of an implied-in-law covenant of good faith and fair dealing are reversed. The trial court is directed to enter judgment against Dennis and Barbara Knapp on their claims for breach of contract. Cathy Brehany's claim of breach of contract is remanded to the trial court for further proceedings. The trial court's judgment on all of the plaintiffs' defamation claims is affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.