**Melanie Ann JOHNSON, Plaintiff,**

v.

**COMMUNITY NURSING SERVICES,**
**and Nora Goicoechea,**
**Defendants.**

**No. 2:95–CV–1116.**

United States District Court,
D. Utah,
Central Division.

Nov. 25, 1997.

---

5. The court notes that plaintiff has failed to respond to this motion and is out of time to do so.

Kathryn Collard, Salt Lake City, UT, for plaintiff.

Michael Patrick O'Brien and Shannon Stewart–Clark, for defendants.

## MEMORANDUM DECISION and ORDER

J. THOMAS GREENE, District Judge.

Oral argument was heard on defendants' Motion for Summary Judgment. Kathryn Collard represents plaintiff and Michael Patrick O'Brien and Shannon Stewart–Clark represent defendants. Following oral argument, a recent Tenth Circuit opinion which is relevant to issues in this case was brought to the court's attention, and supplemental briefing was ordered in light of the decision.

Being fully advised, the court now enters its Memorandum Decision and Order.

## FACTS

Melanie Ann Johnson ("plaintiff") brings this action against Community Nursing Services("CNS") and Nora Goicoechea (collectively "defendants") alleging violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). Plaintiff also seeks relief for a state law defamation claim. Plaintiff's claims arise out of her employment relationship with CNS and essentially involve allegations that plaintiff was sexually harassed and discriminated against by defendant Nora Goicoechea, who was her supervisor.[1]

Plaintiff was employed on June 22, 1994, at CNS as a Manager of the Social Work Team. She was promoted on February 13, 1995, as Clinical Director of Physical, Speech and Occupational Therapy and Social Work. About one month after employment with CNS, David West, a co-employee, called her "sweet cheeks" during a disagreement. She reported this to her supervisor, who at that time was Rick Edge. West was reprimanded for the comment.

In November 1994 plaintiff moved in with a female friend and began a "relationship [that] was lesbian in nature" which lasted three months. Plaintiff claims this "sexual orientation was new for me." In February 1995 plaintiff bought her own home and moved out of her friend's house. Plaintiff had gone on one date with Rowland Gow, a CNS Board Member, in October 1994, and from March through August 1995 plaintiff dated or saw Gow as friends until they decided not to date until the present case was resolved.

Goicoechea is openly lesbian and plaintiff claims that Goicoechea attempted to initiate a sexual relationship with her. At a dinner attended by plaintiff, a CNS co-worker, Goicoechea and Goicoechea's partner, Goicoechea switched from white to red wine and poured the white wine in her glass into plaintiff's glass.[2] In Spring 1995, CNS switched

---

1. Both Melanie Johnson and Nora Goicoechea are female.

2. Plaintiff viewed this as an obvious romantic gesture which produced an awkward silence at the table.

social workers to a system where they were paid for each visit made. Plaintiff and Goicoechea bet a dinner on whether the number of visits would increase. When plaintiff lost the bet, Goicoechea asked her numerous times to pay up and provide the dinner. Plaintiff declined to have dinner with Goicoechea alone, but suggested that another co-worker could accompany them at dinner or that she would have a barbeque for the staff at her home. Goicoechea addressed plaintiff as "Sexy" in front of other co-workers, and told her to get something Goicoechea wanted from a CNS male employee by using her seductive ways. Goicoechea said that if she kissed plaintiff at a meeting, it would show the CNS president that plaintiff was still a lesbian. Goicoechea was flirtatious with plaintiff in a non verbal way.

When Goicoechea learned that plaintiff was dating Gow, and was no longer living with a woman as a lesbian, Goicoechea said she could not protect plaintiff's job because the CNS was paranoid about employees having personal contact with CNS Board members. From the time that plaintiff revealed that she was dating a man, she alleges that Goicoechea was often angry at plaintiff, yelled at her, and quit being supportive.

Goicoechea became increasingly hostile to plaintiff, making the following statements to her: "The therapists don't like you;" "I can't trust you—you are so unpredictable;" "I don't want you smoking with other employees;" and "I don't want you meeting with people in your office with the door shut." In addition, Goicoechea "screamed and yelled" at her in a directors meeting and expressed a lack of confidence in plaintiff. Goicoechea told plaintiff she would be personally liable if a mentally ill patient caused an incident in the lobby and scolded her for being a "poor planner."

Plaintiff acknowledges that around June 22, 1994, she signed a document which indicated that she had received a copy of the CNS employee handbook. The employee handbook contained an Employee Harassment Policy which provided the following:

All CNS & H employees are entitled to work in an environment free of harassment. Company policy and state/federal laws prohibit harassment by fellow employees. Failure to comply with this policy will result in appropriate disciplinary action up to and including separation.

Harassment is defined as unwelcome physical and/or verbal conduct directed toward one employee by another employee.

Harassment exists when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

2. Submission to or rejection of such conduct by an individual is used at the basis for employment decisions affecting such individual; or,

3. Such conduct has the purpose of effect of interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

CNS & H strongly urges any employee who feels subjected to such harassment to communicate this concern either verbally or in writing to your supervisor/manager or the Human Resources Department. Such communications will be kept in strict confidence, if you request.

CNS & H will investigate all employee harassment complaints promptly and take appropriate action.

From March through the end of June, plaintiff talked to Donna Salinas, the manager of the Human Resources Department at CNS, at least 10 times regarding the hostile behavior of Goicoechea towards her. However, in none of these occasions did plaintiff specifically discuss anything regarding the alleged sexual comments or conduct. Salinas responded that she had talked to Goicoechea numerous times about her inappropriate and hostile behavior, but that she couldn't control her behavior. Before plaintiff terminated her employment in June, 1995, Salinas had left CNS leaving plaintiff with no "human resources manager" to whom she could address complaints. Plaintiff contends that prior to her discharge she told Salinas about the "substance" of the sexual harassment. She also claims that she attempted to tell the president of the company, Grant Howarth,

about the specifics of the sexual harassment, with Goicoechea in the room, and that she discussed the "substance" of the sexual harassment with Howarth.

Plaintiff spoke with CNS President Grant Howarth and informed him that she would be leaving because of the hostile and intimidating behavior. He told her to take the following week off to consider her decision. On June 19, 1995, plaintiff went to Howarth's office for a meeting with Goicoechea. Plaintiff attempted to discuss Goicoechea's behavior and stated that she couldn't work at CNS unless Goicoechea was willing to change her behavior towards her. Goicoechea became impatient and stated "I don't have time for this. I'm very busy." The meeting ended abruptly and plaintiff was unable specifically to address the alleged sexual harassment. No other action was taken by CNS, and plaintiff notified CNS of her decision to leave the following day, June 20, 1995.

The day after she left CNS, plaintiff claims that Goicoechea told people in a CNS meeting, in response to a question about why plaintiff left CNS, that plaintiff had a "borderline personality disorder." Plaintiff thereafter wrote Howarth a letter in which she concluded that she was "sexually harassed [by Goicoechea] due to my sexual preference and lifestyle choice which was ultimately different from hers."

Based upon the foregoing factual allegations, plaintiff claims that Goicoechea, her female supervisor, subjected her to sexual harassment, thereby discriminating against her on the basis of her sex. Plaintiff asserts that Goicoechea's harassment was not directed against male employees; that Goicoechea tried to establish sexual relationships with only certain female employees, including herself, and that the defendant engaged in sex discrimination and sexual harassment when such female employees did not respond to her sexual overtures. Plaintiff also asserts a claim for constructive discharge under Title VII [3] and a claim for defamation.

This court previously determined in a Memorandum Decision dated May 28, 1996, that same-sex sexual harassment is actionable under Title VII, and that plaintiff has stated a claim based on sex discrimination, as distinguished from sexual preference discrimination.[4] Defendants now move for summary judgment on the issues of sexual harassment under Title VII and defamation.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment. *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 796 (10th Cir.1997). In applying the summary judgment standard, we must examine the factual record and reasonable inferences therefrom in the light most favorable to the non-movant. *Id.* "We view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury." *Williams v. Rice*, 983 F.2d 177, 179 (10th Cir.1993).

## ANALYSIS

### I. *HOSTILE ENVIRONMENT SEXUAL HARASSMENT*

■ Defendants argue that no reasonable jury could conclude from the facts recited above that they engaged in conduct severe or pervasive enough to impose liability under Title VII of the Civil Rights Act of 1964, for discrimination against an employee on the basis of sex with respect to "compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e–2(a)(1).

**3.** This court's ruling is limited to the sexual harassment and defamation claims because defendants did not include the constructive discharge claim in their summary judgment motion.

**4.** *See Johnson v. Community Nursing Services,* 932 F.Supp. 269 (Utah 1996).

Hostile environment harassment, as distinguished from quid pro quo harassment,[5] occurs when conduct by a supervisor or co-worker is "sufficiently severe or pervasive" to alter the victim's working conditions and "create[s] an abusive working environment." *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir.1996)(quoting *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. at 2405). To be a victim of sex discrimination or harassment, the unpleasant behavior must be due to the gender of the victim. *Id.*

The Tenth Circuit has applied the "steady barrage" test in sexual harassment cases, *Gross v. Burggraf Construction Company*, 53 F.3d 1531 (10th Cir.1995),[6] and has characterized the required intensity of sexual comments or slurs as enough to "permeate" the environment with discriminatory intimidation, ridicule and insult. *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir.1996).[7] The "steady barrage" test is also applied in cases based upon racial harassment.[8]

Plaintiff does not contend that Goicoechea conditioned any privilege of employment on sexual favors, but asserts that Goicoechea discriminated against her based upon her sex and that such discrimination created a hostile and abusive working environment. The one comment which most closely resembles conditioning employment benefits on sexual favors occurred when Goicoechea said she could not "protect" plaintiff's job if plaintiff continued to see a man. However, even when viewed in the light most favorable to plaintiff, this comment does not amount to conditioning job protection on any sexual favors from plaintiff. Accordingly, this court finds that no reasonable jury could find quid pro quo harassment. However, on the same standard, this court finds that a reasonable jury could find hostile environment sexual harassment.

Defendant contends that there is not enough in the comments and conduct set forth above to qualify for hostile work environment sexual harassment because many of the alleged comments were not sexual in nature. However, not all comments have to be sexual in nature. When sexual comments made prior to the existence of an alleged hostile work environment are combined with abusive comments thereafter, a reasonable jury could view the full spectrum of conduct and find that a hostile or abusive work environment existed, and that the abuse was predicated upon plaintiff's gender. A determination of whether sexual harassment is sufficiently severe or pervasive to create a hostile work environment is determined by "the totality of the circumstances." *Meritor Sav. Bank*, 477 U.S. at 69, 106 S.Ct. at 2406, 91 L.Ed.2d at 61; 29 C.F.R. § 1604.11(b) (1985). Accordingly, in this case the sexual comments made prior to plaintiff's notice to Goicoechea that she was dating a man should be considered along with the subsequent allegedly abusive comments.

Based on the foregoing, defendant's motion for summary judgment on the issue of hostile work environment sexual harassment should be denied.

---

5. Quid pro quo harassment occurs where specific benefits of employment are conditioned on sexual demands by the victim's supervisor. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49, 59 (1986) (quoting the Equal Employment Opportunity Commission's Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(a)); *see also Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1443 (10th Cir.1997); *Ball v. Renner*, 54 F.3d 664, 665 n. 2 (10th Cir.1995).

6. In the *Gross* case, the court required plaintiff to present admissible evidence that she was subjected to a steady barrage of opprobrious sexual comments. *Gross*, 53 F.3d at 1543, quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

7. The court said in *Lowe* that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Lowe*, 87 F.3d at 1175, quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citation and internal quotations omitted).

8. The Tenth Circuit has stated: "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments ." *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

## II. EMPLOYER LIABILITY FOR HOSTILE ENVIRONMENT SEXUAL HARASSMENT

■ The recent Tenth Circuit decision which prompted further briefing to the court is *Harrison v. Eddy Potash*, 112 F.3d 1437 (10th Cir.1997). In *Harrison*, the Tenth Circuit held that an employer such as CNS may be held liable for a supervisor's conduct only under the following circumstances:

1) The supervisor committed the harassment while acting in the scope of his employment. (citation omitted); 2) The employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner. (citation omitted); 3) if the employer manifested in the supervisor the authority to act on its behalf, such manifestation resulted in harm to the plaintiff, and the plaintiff acted or relied on the apparent authority in some way. (citation omitted); or 4) If the employer delegated the authority to the supervisor to control the plaintiff's work environment and the supervisor abused that delegated authority by using that authority to aid or facilitate his perpetration of the harassment. (citation omitted).

*Harrison*, 112 F.3d at 1446. In setting forth these factors, the Tenth Circuit panel in *Harrison* adopted similar factors from the Restatement (Second) of Agency § 219.[9]

This court finds no employer liability under the first and third circumstances set forth in *Harrison*. There is no evidence to support a conclusion that Goicoechea was acting within the "scope" of her employment by sexually harassing plaintiff. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987) (Sexual harassment is not within the job description of any supervisor or worker in any reputable business.). Also, the facts of this case do not implicate apparent authority liability. There is no indication that the actions of Goicoechea were done on behalf of CNS, thus cloaking Goicoechea with "apparent" authority reasonably relied upon by plaintiff to her detriment.

However, under the second circumstance identified in *Harrison*, a reasonable jury could find that CNS "should have known" of the harassment. For instance, Johnson reported the harassment to Salinas, but she was incapable of controlling Goicoechea. Johnson was in the process of reporting the harassment to Howarth in Goicoechea's presence, but Goicoechea abruptly ended the discussion by leaving. A jury could reasonably conclude, coupled with other facts, that the employer should have known about the harassment and responded appropriately.

Also, a reasonable jury could find Community Nursing liable for "aiding and facilitating" under the fourth circumstance identified in *Harrison*. It is clear that CNS delegated supervisory control over plaintiff to Goicoechea. Based on the nature and substance of the conduct and comments before the court, under *Harrison*, a reasonable jury could conclude that Goicoechea abused her authority and used that authority to aid her in facilitating the alleged harassment. This presents a question of fact to be determined at trial.[10]

## III. PLAINTIFF'S DEFAMATION CLAIM

### A. Slander Per Se

■ Slander *per se* under Utah law is a form of defamation wherein a showing of

---

9. Restatement (Second) of Agency § 219 states:

    § 219. WHEN MASTER IS LIABLE FOR TORTS OF HIS SERVANTS

    (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment. (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: (a) the master intended the conduct or the consequences, or (b) the master was negligent or reckless, or (c) the conduct violated a non-delegable duty of the master, or (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

10. The *Harrison* court found that the "aiding and facilitating" factor of employer liability allows an employer to be held liable, even if a sexual harassment policy is in place and is made known to the plaintiff, where the supervisor uses his or her actual authority to aid or facilitate the perpetration of the harassment. *Harrison*, 112 F.3d at 1446. Since the case at bar was submitted for decision, the Supreme Court has granted certiorari in a case arising in the Eleventh Circuit, *Faragher v. Boca Raton*, 111 F.3d 1530 (11th Cir.1997). The Eleventh Circuit imposed a higher and different burden on plaintiffs to establish employer liability for workplace sexual harassment because of acts of supervisors than was adopted by the Tenth Circuit in *Harrison*.

special harm is not required because damages and malice are implied in certain situations, including: (1) charge of criminal conduct, (2) charge of some loathsome disease, (3) charge of conduct that is incongruous with the exercise of lawful business, trade, profession or office, and (4) charge of unchastity of a woman. *Allred v. Cook*, 590 P.2d 318, 320–21 (Utah 1979); *Larson v. SYSCO Corp.*, 767 P.2d 557, 560 (Utah 1989). The statement or charge in question must not be susceptible to any meaning other than one falling plainly and unambiguously within any of the four categories outlined above. If it is capable of two interpretations, such as one which might refer to the plaintiff's professional reputation and one which might refer to his personal character, "it cannot be slander per se." *Allred*, 590 P.2d at 321. Furthermore, the type of statement required to constitute slander *per se* in regards to plaintiff's professional reputation necessarily must, "as its natural and proximate consequence, compel the conclusion that plaintiff will be damaged." *Larson*, 767 P.2d. at 560 (citing *Baum v. Gillman*, 667 P.2d 41, 43 (Utah 1983)). Speculation as to some future injury or difficulty does not give rise to a cause of action as defamation *per se*. *Id.*

■ Plaintiff claims defamation *per se* because Goicoechea stated to members of the CNS psychiatric team that plaintiff left CNS because she had a "borderline personality disorder." This characterization of a disorder has special meaning to mental health professionals, constituting a shorthand description of a specific psychiatric condition that is largely untreatable. Plaintiff claims that the statement is false and that it would be incompatible with her employment as a psychiatric nurse.[11] Plaintiff did not plead any special damages in her complaint, and admitted that she has no facts to demonstrate actual or pecuniary injury from the statement at issue.

Taken in the light most favorable to plaintiff as the non-moving party, Goicoechea's comment was made in a professional meeting to professional peers and those who heard it

were shocked and knew that this comment referred to a serious mental illness that was incompatible with plaintiff's future employment as a psychiatric nurse. Thus, rather then a general comment about an employee's "poor performance," as was the case in *Larson*, a fact finder could determine that the "borderline personality disorder" comment was pointedly directed at a specific and extreme mental disease which would necessarily injure plaintiff in her chosen profession.

In *Allred*, plaintiff had been the superintendent of schools and enjoyed an excellent reputation. Defendants sought to remove him from office, and obtained election to membership of the school board. One defendant told plaintiff that we [the defendants] "have twenty-seven charges against you and if you do not resign, we will bring those charges out in public at the next Board meeting." *Allred*, 590 P.2d at 320. Each defendant told many persons of the twenty-seven charges. The Utah Supreme Court held that the statement did not necessarily refer to professional reputation rather than personal reputation. The court said that while some may imply criminal conduct from the "charges" comment, others would not. *Id.* at 321. In contrast, if a fact finder should determine that the comment in this case charged a specific mental disease rather than personal conduct in the manner of plaintiff's leaving the job site, it would constitute a comment not capable of two interpretations.

Based upon the foregoing, this court rules that defendant's comment could be found by a jury to have constituted reference to a specific mental illness sufficient to establish defamation *per se*.

B. *Privilege*

■ Under Utah law, there exists a qualified privilege protecting an employer's communication to employees and to other interested parties concerning the reason for the employee's discharge. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991). This privilege protects statements made to advance a legitimate common interest be-

---

**11.** Several CNS mental health professionals testified that no employer would hire an individual who had such a disorder. However, those who heard it testified that it characterized her personal conduct in the manner in which plaintiff left CNS, rather than her trade or profession.

tween a publisher and the recipient of the publication. *Lind v. Lynch,* 665 P.2d 1276, 1278 (Utah 1983); *Restatement (Second) of Torts* § 596 (1977). If the privilege attaches to the statement, then the plaintiff has the burden to prove that the privilege was abused through evidence of malice [12] or excessive publication. *Id.* at 58–59. Whether a publication is conditionally privileged is a matter of law, unless a genuine factual issue exists regarding whether the defendant acted with malice,[13] which is ordinarily a fact question. *Lind,* 665 P.2d at 1278–79; *Brehany,* 812 P.2d at 58–59. The "malice" required to overcome the conditional privilege consists of proof that the utterances were made from spite, ill will, or hatred toward plaintiff. *Combes v. Montgomery Ward & Co.,* 119 Utah 407, 415–17, 228 P.2d 272, 276–77 (1951).

■ Defendants argue that the statement was a "shorthand" characterization of plaintiff's conduct in leaving CNS. They assert that no one that heard the statement would regard it as a diagnosis or insinuation of any personality disorder. Plaintiff responds that the issue is the content of the statement, whether it was made maliciously and whether it is a false statement.

The court finds that Goicoechea's statement was conditionally privileged. In *Brehany,* Nordstrom had a policy against drug use by its employees. Plaintiffs Dennis Knapp (Dennis), Barbara Knapp (Barbara) and Cathy Brehany (Cathy) were employees of Nordstroms, and all were discharged. Following an internal Nordstrom investigation, Dennis was told he was fired for using drugs, Barbara was told she was fired because she was Dennis' wife, and Cathy was told she was fired for supplying drugs to employees. Dennis and Barbara admitted using marijuana either in the presence of Nordstrom employees or while representing Nordstroms. Cathy denied using drugs but admitted association with others who used drugs. *Brehany,* 812 P.2d at 52. Nordstroms reported to managers and buyers that the terminations

of the plaintiffs were related to drugs and plaintiffs sued for defamation, among other causes of action. *Id.* at 59. The Utah Supreme Court found that the statements regarding the reason for the termination of plaintiff were conditionally privileged, and that Cathy Brehany had failed to allege malice in her complaint. *Id.* By way of contrast, plaintiff in this case did allege and present some evidence of malice.

In the present case, Goicoechea's comment was made at a Psychiatric Team Meeting at CNS, after plaintiff left work at CNS. Plaintiff alleges that Goicoechea stated that plaintiff was no longer at CNS because she had a "borderline personality disorder." Goicoechea contends that the statement was made as a communication to other employees and specifically relates to the manner in which plaintiff left CNS. As such, the statement must necessarily be conditionally privileged.

Notwithstanding the foregoing, a factual issue exists as to whether defendant acted with malice, which precludes entry of summary judgment on the defamation claim. At trial, plaintiff will have to shoulder the burden of proof to overcome the privilege and to establish the existence of malice.

### C. *Non-Actionable Opinion*

■ Defendants also argue that the statement is a non-actionable opinion. The Utah Supreme Court has held that expressions of opinion are protected by the Utah Constitution from defamation liability, and this protection is "abused" when the opinion states or implies facts that are false and defamatory. *West v. Thomson Newspapers,* 872 P.2d 999, 1015 (Utah 1994). Opinions embody ideas, not facts, and therefore are incapable of verification. The court in *West* adopted a non-exhaustive four part test for distinguishing between fact from opinion:

> 1) the common usage or meaning of the words used; 2) whether the statement is capable of being objectively verified as true or false; 3) the full context of the

---

12. The malice herein discussed is the malice required to rebut the qualified privilege of defamation, which is distinct from the malice imputed in all defamatory statements.

13. Plaintiff has alleged malice in paragraph 27 of her complaint, and submitted evidence in support. Therefore has not waived this issue.

statement—for example the entire article or column—in which the defamatory statement is made; and 4) the broader setting in which the statement appears. *West,* 872 P.2d at 1018.[14] The court will address the identified factors seriatim as they apply to this case. *First,* whether there is common usage or meaning of the words used. There essentially is no dispute that a "borderline personality disorder" is a term of art in the mental health community which describes a largely untreatable mental illness. *Second,* whether the statement is capable of being objectively verified as true or false. Defendants argue that the statement isn't provable or verifiable and that Goicoechea only gave it as a characterization of the way she left work. There is a factual dispute over whether Goicoechea stated that plaintiff left work in a "borderline snit," thus describing the manner in which she left work, or whether she stated that plaintiff left CNS because *she had* a "borderline personality disorder." Although several of the persons at the meeting where the comment was made provided testimony in affidavits that they understood the statement to be a psychiatric shorthand way of characterizing Johnson's behavior when she left her CNS employment, this court, on summary judgment, must view the facts in a light most favorable to the party opposing the motion. Therefore, assuming for purposes of summary judgment analysis that Goicoechea stated that plaintiff *had* a borderline personality disorder, such a mental disease would be objectively verifiable through psychiatric evaluation.[15]

As to the *third* and *fourth* inquiries, the Utah Supreme Court essentially lumped these together to consider the context and broader setting in which the statements were made. *Id.* Under the "full context" and "broader setting" factors, the statement in this case was made to co-workers of the CNS psychiatric team in a professional setting, all of whom had mental health training and knew the specialized meaning of the terms.[16]

14. The Court of Appeals for the District of Columbia's en banc decision in *Ollman v. Evans,* 750 F.2d 970, 979 (D.C.Cir.1984)(en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), stated:

First, we will analyze the common usage or meaning of the specific language of the challenged statement itself. Our analysis of the specific language under scrutiny will be aimed at determining whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. (citation omitted). Readers are, in our judgment, considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning. Second, we will consider the statement's verifiability—is the statement capable of being objectively characterized as true or false? (citation omitted) Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content. And, in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything but speculation. Third, moving from the challenged language itself, we will consider the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content. (citations omitted). Finally, we will consider the broader context or setting in which the statement appears. Different types of writing have, as we shall more fully see, widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion. (citation omitted).

The decision in *Ollman* contains several concurring and dissenting opinions. The majority opinion, as well as the concurring opinions of Judges Bork, joined by Judges Wilkey, Ginsburg and MacKinnon and Judge MacKinnon writing separately, supported a flexible "totality of the circumstances" test for determining whether a statement is fact or opinion. *Ollman,* 750 F.2d at 979, 997, 1016.

15. This conclusion is consistent with the *West* holding. In *West,* a politician, Terry West, sued a newspaper over comments made in several published columns. West asserted that the newspaper implied that he misrepresented his position on a municipal power issue to win the election. The court concluded that whether West actually intended to dupe voters into electing him mayor by misrepresenting his position on the issue is a subjective fact that only Terry West would know, and not something that is objectively verifiable. *West,* 872 P.2d at 1019.

16. In *West,* the Supreme Court of Utah determined that Terry West, as a politician, exposed himself to harsh and possibly defamatory criticism in the form of opinion by running for office, and that the statements found in the editorial columns in the newspaper came in the context of a classic example of political commentary. As

Factual determinations concerning the factors as such relate to this case must be made at trial.

Based on the foregoing, it is hereby

ORDERED, that defendants' Motion for Summary Judgment is DENIED.

such, the speech was afforded protection by the state constitution. *West,* 872 P.2d. at 1020.