Ivan J. HESLOP, Plaintiff, Appellee
and Cross–Appellant,

v.

BANK OF UTAH, A Utah banking
corporation, Defendant, Appellant,
and Cross–Appellee.

No. 900532.

Supreme Court of Utah.

Sept. 4, 1992.

Rehearing Denied Sept. 30, 1992.

Ronald E. Griffin, Salt Lake City, for Heslop.

Glenn C. Hanni, Stuart H. Schultz, Salt Lake City, for Bank of Utah.

HALL, Chief Justice:

Defendant Bank of Utah appeals from a jury verdict awarding Ivan J. Heslop damages for wrongful termination and from the trial court's refusal to grant a new trial. Plaintiff Heslop cross-appeals the trial court's refusal to instruct the jury on consequential damages arising from his termination, including attorney fees, and its decision granting defendant's motion for a directed verdict dismissing plaintiff's public policy claims. We affirm the trial court's denial of defendant's motion for a new trial. We reverse for failure to allow the jury to award Heslop consequential damages and the dismissal of Heslop's public policy claims.

## I. FACTS

"Where evidence is in conflict in a jury trial, we assume that the jury believed those facts that support its verdict, and we view the facts and the reasonable inferences that arise from those facts in a light most supportive of the jury's verdict."[1] We therefore recite the following facts in a light most favorable to the jury's verdict. Heslop began employment with the Bank of Utah (the "Bank") in March 1955. He worked first as a collector and then as a loan officer until the fall of 1959. On January 26, 1955, prior to his employment with the Bank, Heslop completed an application that contained the following clause:

I agree that my employment will depend upon usefulness to the bank, in its sole discretion; the bank reserving the right to release me without notice, its obligation ending with the payment of salary through the last day I work.

In 1962, Heslop again applied for employment with the Bank. Heslop met with Roderick Browning and William Beutler, both officers of the Bank. At that interview, Browning and Beutler informed Heslop about the Bank's personnel policies of seniority, promotion from within the organization, and termination only for good cause. The interviewers explained that the Bank terminated only for good cause because it wanted to provide an incentive for employees to develop experience and remain with the Bank. Heslop did not sign another employment application on reemployment with the Bank in 1962.

At trial, Heslop testified that he understood he would have employment at the Bank until he retired unless the Bank terminated him for good cause. Several other present and former employees of the Bank

---

1. *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1082 (Utah 1985) (citations omitted); *see also Cintron v. Milkovich*, 611 P.2d 730, 732 (Utah 1980).

also testified that they understood the Bank's personnel policy to allow termination for good cause only. The Bank's interviewers never told Heslop that the Bank would revive the employment application he signed in 1955 or would construe the application as an employment contract with the Bank.

In 1963, the Bank promoted Heslop to assistant vice president and appointed him an officer of the Bank. In 1966, the Bank promoted Heslop to vice president. He was appointed to the Officers' Executive Committee (the "OEC") in 1976. The OEC had general responsibility for the management of the Bank. In 1980, the Bank made Heslop senior vice president and manager of the Bank's Salt Lake Division.

In 1980, Beutler discovered that a problem in the Bank's computer system caused an over-accrual of the commercial loan account and an under-accrual of the time certificates of deposit ("TCD") account. The problem resulted in an overstatement of the Bank's income. In February 1981, Beutler informed the OEC members of the accrual problem. He told the OEC that the error in the accrual account could equal as much as $200,000. Beutler also informed Browning (the current president) of the problem. Heslop asked if Beutler could correct the accrual problem before the Bank's next required call report to the State Department of Financial Institutions. Beutler said yes.

At the November 1981 OEC meeting, Heslop asked Beutler if he had corrected the accrual problem. Beutler said that he had not and that the deficiency had grown to between one-half million and one million dollars. Heslop complained that the call reports misrepresented the Bank's income and assets. He insisted that Beutler inform Browning of the problem. Beutler disagreed, but consented to place the matter on the agenda for the next OEC report to Browning. However, Beutler failed to mention the accrual problem at that meeting.

After the meeting, Heslop returned to his office and telephoned Browning to report the accrual deficiency. He told Browning that he believed his call would offend Beutler and offered to find another job if Browning wished to avoid conflict. Browning responded that he would handle the problem without telling Beutler of the call. After receiving the call, Browning asked Beutler to come to his office. Browning informed Beutler of Heslop's call. Browning was annoyed that Heslop had "opened the lid" on the accrual problem and said that he would have to bring the problem to the attention of the board of directors (the "Board").

At the following OEC meeting, Beutler told Heslop that he knew about the call to Browning. The two argued, and Beutler threatened Heslop's job. Heslop argued that the Bank should forego profit sharing and dividends to immediately resolve the accrual deficiency. At that time, the Bank was operating near the lowest acceptable level of the capital requirement instituted by the Federal Reserve. Any charge-off or other action that reduced Bank capital would require a recapitalization of the Bank to bring the capitalization ratio up to Federal Reserve requirements. This would require one to two million dollars of capital investment by stockholders. Browning would have to contribute approximately half that amount to maintain his family share of 50 percent or greater ownership in the Bank.

At the Board's meeting, Beutler and Browning argued to resolve the accrual problem through monthly installment charges against undivided profits over a period of time. Beutler told the Board that he had consulted with an accountant about this method. Heslop continued to argue for immediate resolution of the accrual problem. He also argued against filing call reports before the Bank corrected the account. The Board voted to implement Beutler's recommendation to correct the account over time, although four Board members knew about Heslop's concerns regarding the call reports.

In December 1981, Heslop began preparing personal notes about events relating to the accrual problem. Browning told James Packer, an OEC member, that he disap-

proved of Heslop for not supporting the Board's method of resolving the accrual problem. David Kunz, a member of the Board and bank counsel, resented Heslop for exposing the accrual problem. He stated that Heslop should have been a team player like the other OEC members. Kunz instructed Packer to monitor some of Heslop's activities.

In March 1981, Beutler began making "wash entries" in the accrual account when the quarterly call reports came due. The wash entries hid the deficiency in the account from bank regulators. Packer knew of these entries, and other officers and directors may also have known. Heslop did not know of the wash entries.

On July 9, 1982, Beutler sent a letter to federal and state bank regulators, informing them of the accrual problem and of the Bank's method for solving the problem. The regulators began a regular examination of the Bank and immediately investigated the accrual problem. Beutler told the examiners that he did not inform the regulators of the accrual problem on the call reports because the Bank wanted to avoid injecting more capital. Beutler also said that all directors knew of the situation. On August 6, 1982, Elaine Weis, Commissioner of the Utah Department of Financial Institutions (the "Department") called a special meeting of the Bank's Board at her office. At the meeting, Weis issued an order (1) suspending Beutler as executive vice president pending a hearing; (2) requiring an immediate outside audit of the Bank; (3) requiring that the commissioner place a representative in residence at the Bank; (4) requiring the Bank to file corrected call reports; (5) precluding the transfer of certain Bank assets; and (6) specifically finding that Beutler violated Utah Code Ann. § 7–1–318, relating to the filing of false call reports.

The following week, Kunz requested that Beutler resign. Beutler protested, but after some bargaining about termination pay, agreed to resign and to waive his right to a hearing on his suspension.

Weis appointed Ron Draughon as the Department's representative in residence at the Bank. In mid-August, Draughon asked Browning and Kunz if they had previously known how large the accrual problem had grown. Browning expressed surprise and stated that he did not realize the Bank had such a big problem. Kunz did not respond in a surprised manner. He said he did not realize the extent of the problem. Draughon asked Heslop if other officers and directors knew of the accrual problem prior to the examination. Heslop explained that the OEC, the Board, the auditor, Browning, and Kunz all knew of the accrual problem. Draughon returned a short time later and said that they claimed they did not know about it.

In September 1982, the Utah Attorney General's office (the "Attorney General") began an investigation of the Bank for possible criminal wrongdoing. Heslop received a telephone call on September 13, 1982, asking him to meet with an attorney from that office. Heslop agreed, but requested that the Attorney General subpoena his testimony and documentary evidence and that he have counsel present during the questioning. He was concerned about his future employment and the appearance that he instigated the investigation.

That evening, Kunz called Heslop at home and became angry when he learned that Heslop had met with the Attorney General. Heslop explained that he gave no information and requested legal counsel and a subpoena. Kunz said that the Bank did not want the investigation made public and by issuing subpoenas, the matter would become public knowledge. On September 23, 1982, the Attorney General called Heslop and said that he had authorization to serve Heslop with a subpoena.

The Bank retained counsel to represent it in the Attorney General's investigation. Heslop met with Bank counsel on October 12, 1982. He requested his own attorney because he felt that Bank counsel had a conflict of interest. Counsel downplayed the need for separate representation and eventually persuaded Heslop to surrender his personal notes to protect them as privileged and not subject to subpoena. Counsel then told Browning about the notes,

stating that they were derogatory toward Bank management.

On November 15, 1982, Heslop had a meeting with Bank counsel and the Attorney General. Counsel argued for an end to the investigation. Heslop stated that he did not think any of the directors signed the call reports with the intent to defraud the Bank. Later, Heslop called the Attorney General and inquired about the status of the investigation. The Attorney General told Heslop that it may have been concluded and that it would issue no subpoenas.

Weis's order of August 6, 1982, required the Bank to hire an independent accounting firm, designated by the Commissioner, to perform a complete audit of the Bank's records. Weis designated the accounting firm of Peat, Marwick & Mitchell ("PMM"). Thomas Timmons supervised the audit for PMM. Timmons told the Bank's Board that PMM would conduct a complete audit of the Bank's records for the years 1980, 1981, and through July 1982 for approximately $84,000. This would include the cost of reconstructing the books. After beginning work on the audit, PMM discovered that it could not complete all the work requested by Weis. Instead, PMM limited its work to a balance sheet audit. The services not provided equalled approximately $25,000.

Timmons spoke to the Attorney General about the Bank in late 1982. He characterized the Bank's problems as the result of incompetence and mistake and urged an end to the investigation. Timmons also proposed a profitability study of the Bank by PMM. The estimated cost was $80,000. Some Bank officers, including Heslop, opposed the study because of the excessive cost and the availability of doing the study in-house. The Board approved the study over the objection of senior management. PMM also audited the Bank for the remaining months of 1982. The total bill for PMM's work amounted to $455,930.68. PMM completed the work by the end of December 1982. The audit report recommended that the Bank resolve the accrual deficiency by a one-time charge to undivided profits, the same solution initially proposed by Heslop.

The Bank hired Timmons as president on December 17, 1982. The Bank paid him a signing bonus of $60,000 and an annual salary of $150,000, with 10 percent annual increases and a bonus based on profitability. This amount was more than double the salary of Browning, the previous president.

When Timmons assumed the position of president, he made sweeping changes in the Bank's operations. He reorganized personnel and sold approximately eight branches. Although the Bank claimed financial difficulty and laid off employees, it constructed a lavish office in Salt Lake City for Timmons.

The Bank changed many top management positions. It transferred Heslop from Salt Lake City to the Ogden branch and changed his position to "agricultural loan specialist." The Bank removed Heslop's supervisory and managerial responsibilities and placed him at the lowest level for a loan officer. Heslop maintained the title of senior vice president, but Timmons abolished the OEC, so the title carried no responsibility or prestige. In addition, the Bank substantially reduced Heslop's benefits. He objected to the demotion and asked to speak to Browning. Timmons told him that the matter had been decided. Heslop met with Browning and objected to the demotion. He asked if the Bank wanted him to resign, and Browning asked him to stay with the Bank. Browning later stated that he did not accept the resignation because he did not want to have a turnover in key personnel at a critical time for the Bank.

After the Bank gave Heslop the title of agricultural loan specialist, Timmons verbally instituted a policy that the Bank would no longer make any agricultural loans. The Bank modified the policy and incorporated it into its written loan policy effective April 1983. This loan policy listed types of desirable and undesirable loans. The Bank would ordinarily decline undesirable loans unless specifically approved by the loan committee.

In July 1983, Beutler sued the Bank for wrongful discharge and subpoenaed Heslop's personal notes. Heslop complied with the subpoena, and the Bank's attorneys obtained a copy of his notes. The attorneys allowed Timmons to view the notes.

In August 1983, Larry Richins approached Heslop about a $260,000 loan to Dr. Clayton Gabbert. Gabbert wanted the loan for a tax shelter consisting of 310 head of cattle, which he would then lease to Richins' Dairy in Newton, Utah. Experienced herdsman would run the dairy. The lease payments would repay the loan to the Bank, and the cattle would secure the loan. At that time, dairy cows cost approximately $1,000 per head. Gabbert would use the loan to purchase 260 cows and would himself contribute $50,000 for 50 more cows, which would constitute additional security for the loan.

On August 5, 1983, Heslop presented the Gabbert loan to the loan committee for approval. The loan committee approved the loan, subject to the condition that Gabbert either show a $50,000 investment in dairy cows or give the Bank a second mortgage on his second home in Bountiful, Utah. Gabbert listed this home on his financial statement, showing a value of approximately $90,000 with an estimated $38,000 mortgage. Gabbert agreed to pledge the Bountiful property as additional security. Heslop informed Gerald West, chairman of the loan committee, that Gabbert agreed to the second mortgage. West instructed Heslop to commit on the loan. Heslop asked if he should wait for the Bank's appraisal on the Bountiful property or present the loan to the committee again; West said no. Heslop committed the Bank to make the Gabbert loan. West initialed the loan approval report. The combination of West's and Heslop's total lending authority sufficiently covered the Gabbert loan. West testified that he believed the Gabbert loan was correctly approved.

After Heslop approved the loan, the Bank's appraiser appraised the Bountiful property at $45,000 with a mortgage of $33,000. The second week in September 1983, Boyd Carlson, the Bank's loan review officer, prepared a loan review and comment report on the Gabbert loan. The comment report consisted of a list of questions about the loan. Carlson requested that Heslop promptly return the answers with additional documentation so that he could arrive at a credit rating on the loan. Heslop received the review, answered the questions, and placed the document in the interoffice mail for delivery back to Carlson. West later returned the review to Heslop, after receiving it from Timmons. Timmons did not like some of Heslop's answers and wanted them changed. Heslop changed his answers and provided additional information to please Timmons.

In September 1983, the Bank terminated Heslop's authority to administer the Gabbert loan. On September 29, 1983, Heslop received a copy of a memorandum from Timmons to West which specifically removed all of Heslop's lending authority. The memorandum accused Heslop of violating the letter and spirit of the Bank's written loan policy in making the Gabbert loan. It did not specify which provision of the policy the Gabbert loan violated. West told Timmons that the Gabbert loan did not violate loan policy and explained that he and the committee had approved the loan. Timmons insisted that the loan violated Bank policy, but did not identify the policy other than to say that it was an agricultural loan.

After receiving the memorandum, Heslop requested three days of vacation to contemplate his response to the memorandum. Heslop's supervisor allowed the vacation leave. Heslop sent a certified letter, dated October 3, 1983, to Browning and a copy by mail to each member of the Board. The letter conveyed his belief that the Bank was forcing him out and specifically requested a hearing on the accusation that he had violated the loan policy.

On October 4, 1983, Heslop received a telephone call from Kleyn, his supervisor. Kleyn said that Timmons wanted Heslop to submit his resignation in writing. Heslop replied that he had not resigned and inquired about his request for a hearing before the Board. Kleyn said the request

had been denied. Heslop asked whether the Board or Timmons made that decision. Kleyn did not know.

The next day, Heslop returned to the Bank and met with Kleyn. He wrote a letter of resignation and delivered it to Kleyn. The letter began, "At your request, I am submitting in writing my notice of resignation from the Bank of Utah." Heslop did not know that Timmons did not have authority from the Board to fire him.

After Heslop returned home, he received another call from Kleyn. Kleyn said that the Board had agreed to a hearing at 9 a.m. on October 6, the following morning. At that meeting, Heslop spoke to the Board. He requested a response to the issues raised in his October 3, 1983 letter to the directors. He said that he would continue employment with the Bank so long as he received a reasonable assignment. Some of the directors did not know that Timmons had requested Heslop's resignation. The directors asked no questions and made no comments after Heslop spoke. They sent him a letter dated October 6, 1983, which stated that Heslop had resigned and the Board had accepted the resignation. Heslop confronted the personnel manager about the inaccurate statements in the letter. Heslop's separation notice and final paycheck were dated October 5, 1983.

The Bank never filled the position of agricultural loan specialist after Heslop left. No other loan officer had his or her lending authority revoked because he or she made a bad loan or one that violated Bank policy. Heslop had a good record as a loan officer and an employee at the Bank.

## II. RETROACTIVE APPLICATION OF *BERUBE*

■ The Bank argues that this court should not apply the law as stated in our case of *Berube v. Fashion Centre, Ltd.*[2] to the present case, because Heslop's cause of action arose prior to our decision in *Berube*. The Bank argues that *Berube* significantly changed the law in Utah with regard to employment at-will and that the Bank relied on prior law. Because Heslop's termination occurred prior to the *Berube* decision, the Bank continues, the decision should apply prospectively only and not to his claims.

■ While we have never squarely addressed the appropriateness of applying *Berube* retrospectively, we have repeatedly allowed its retrospective application in practice.[3] In the vast majority of cases, the stated law of a decision is effective both prospectively and retrospectively, even a decision which overrules prior law.[4] Therefore, unless a substantial injustice would occur from retrospective application, we will apply a decision both prospectively and retrospectively.[5]

An examination of *Berube* leads us to conclude that retroactive application of that decision will not work a substantial injustice on employers. *Berube* carved out an exception to the traditional employment-at-will doctrine. It did not overrule employment at will. Under *Berube*, an employer may create an impied-in-fact contract for employment that is not a contract at-will. An employer does this by making representations or promises that employees reasonably understand to constitute something other than employment at-will. *Berube*, which makes representations or promises of employment other than at-will legally enforceable, affects only those employers who make or imply such promises to their employees. *Berube* works no substantial injustice by requiring employers who expressly or impliedly promise employment for other than at-will to stand by that

**2.** 771 P.2d 1033 (Utah 1989).

**3.** *Peterson v. Browning,* 832 P.2d 1280 (Utah 1991); *Johnson v. Morton Thiokol,* 818 P.2d 997 (Utah 1991); *Brehany v. Nordstrom,* 812 P.2d 49 (Utah 1991); *Hodges v. Gibson Prod., Co.,* 811 P.2d 151 (Utah 1991); *Arnold v. B.J. Titan Servs. Co.,* 783 P.2d 541 (Utah 1989); *Lowe v. Sorenson Research Co.,* 779 P.2d 668 (Utah 1989); *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483 (Utah 1989).

**4.** *Malan v. Lewis,* 693 P.2d 661, 676 (Utah 1984); *Loyal Order of Moose v. County Bd. of Equalization,* 657 P.2d 257, 264–65 (Utah 1982).

**5.** *Malan,* 693 P.2d at 676.

promise. Therefore, the trial court correctly ruled that *Berube* applied to Heslop's claims.

## III. STATUTE OF FRAUDS

■ Defendant next claims that the trial court should have ruled that plaintiff's claims were barred by the statute of frauds. As support for this claim, defendant cites to plaintiff's testimony that he understood he had a contract for employment until retirement unless the Bank terminated him for cause. Because plaintiff testified that the normal age for retirement is 65, defendant argues that the alleged oral contract extended beyond one year and therefore violated the statute of frauds.[6]

Defendant's argument ignores the requirements of the statute of frauds. "[T]he statute has long been construed narrowly and literally.... [It] applies only to those contracts whose performance could not possibly or conceivably be completed within one year.... [A]ny contingent event could complete the terms of the contract within one year."[7] The employment contract alleged by plaintiff did not necessarily extend beyond a year; it merely stated that the Bank would continue to employ plaintiff throughout his career unless it found cause to terminate him. The fact that plaintiff expected his career to last until age 65 did not mean that the parties could not perform his contract within one year. The implied contract alleged by Heslop did not violate the statute of frauds.

## IV. PUBLIC POLICY

Plaintiff appeals the trial court's dismissal of his claims for wrongful termination in violation of public policy. Plaintiff brought both tort and contract claims on the ground that his termination violated public policy.

He based both claims on essentially the same facts: that he protested the method used to solve the accrual problem and, as a result, fell out of favor with the Bank.

The trial court dismissed plaintiff's public policy tort claim on the basis of our decision in *Lowe v. Sorenson Research Co.*[8] The trial court determined that *Lowe* precluded a tort claim for termination in violation of public policy. After plaintiff presented his case-in-chief to the jury, the trial court granted defendant's motion for a directed verdict on plaintiff's contract public policy claim. The trial court stated that because of the long time period between the dispute over the accrual problem and plaintiff's termination, no reasonable jury could conclude that plaintiff's termination resulted from a violation of public policy.

In *Peterson v. Browning Co.*,[9] our most recent employment decision, we recognized a plaintiff's claim that his termination violated public policy.[10] The *Peterson* opinion further defined the scope and effect of our prior employment decisions by holding that terminations in violation of public policy give rise to a cause of action in tort. Therefore, the trial court's ruling that Utah does not recognize a tort claim for termination in violation of public policy was incorrect.

However, because the trial court did not dismiss Heslop's public policy claim sounding in contract, it allowed him to present essentially the same facts to the jury under his contract claim. Therefore, we must examine the trial court's dismissal of this claim on defendant's motion for directed verdict. If the trial court correctly granted a directed verdict due to lack of evidence on the contract public policy claim, it fol-

---

6. Utah Code Ann. § 25-5-4.

7. *Hodge v. Evans Fin. Corp.*, 823 F.2d 559, 561-62 (D.C.Cir.1987) (citing Restatement (Second) of Contracts § 130 cmt. a (1979); 2 Arthur L. Corbin, *Corbin on Contracts* § 445, at 542-43 (1950 & Supp.1984); 3 D. Samuel Williston, *A Treatise on the Law of Contracts* § 495, at 577-83 (3d ed. 1960)).

8. 779 P.2d 668 (Utah 1989).

9. 832 P.2d 1280 (Utah 1992).

10. *Peterson* was filed in the federal court system and brought before this court on certification from the United States District Court for the District of Utah. Nevertheless, our decision recognized that Peterson's claims arose before *Berube* but allowed the claims to go forward. *See Peterson*, 832 P.2d at 1282-1283.

lows that plaintiff did not present sufficient evidence to support a public policy claim under *Peterson*. The dismissal of his tort claim would therefore be harmless. However, if the decision dismissing plaintiff's contract public policy claim was improper because he presented sufficient evidence to present the public policy claim to the jury, then we must remand the case to allow presentation of this claim on a tort basis.

■ Our review of cases from other jurisdictions that recognize public policy claims reveals that examination of a public policy claim generally poses three questions: (1) Does the plaintiff's termination implicate a clear and substantial public policy? (2) Did the employer violate this public policy by requiring the employee to engage in conduct violating the policy or by punishing conduct furthering the policy? (3) Was violation of this public policy a substantial factor in the plaintiff's termination? [11]

■ Our first step is therefore to determine whether Heslop has alleged violation of a clear, substantial, and significant public policy. Heslop alleges that the Bank terminated him for his insistence that it adhere to the Utah Financial Institutions Act (the "Act"), specifically Utah Code Ann. § 7–1–318. This section requires all banks and financial institutions to make at least two call reports annually to the Commissioner regarding their financial status and security. The president of the bank and at least three bank directors must verify these reports. Each bank must then publish the reports in a newspaper of general circulation in the county of its principal office. The stated purpose of the reports and of the Act, in general, is to

strengthen the regulation, supervision, and examination of persons, firms, corporations, associations, and other business entities furnishing financial services to the people of this state or owning and controlling those businesses ... in order to promote competitive equality in the financial services industry in this state *and to protect the interests of shareholders, members, depositors, and other customers of state chartered institutions.*[12]

The Act regulates bank conduct and ensures the safety of financial institutions in the state. The Act serves a substantial public policy because it protects the public as well as regulates the institutions themselves. The Act, therefore, does not merely regulate the relationship between private individuals such as employer and employee.[13] The public purpose of the Act is further evidenced by the penalties enforced for its violation. Section 7–1–318 makes failure or refusal to submit accurate and timely call reports a third degree felony. We find that the reporting requirements of the Act promote a substantial and clear public policy of accountability of financial institutions; therefore, plaintiff has met the first requirement of our review.

Since we have determined that the Act and the reporting requirements under the Act contain substantial public policies, we now must determine whether plaintiff acted in furtherance of or refused to violate those policies. Plaintiff did not present evidence that the Bank required him to do anything prohibited by the Act. He did, however, present evidence that he vocally insisted on adherence to the Act by refusing to agree to a long-term solution to the accrual problem. He presented evidence that he complained to Beutler, phoned

11. *See, e.g., Wagner v. City of Globe,* 150 Ariz. 82, 88–90, 722 P.2d 250, 256–58 (1986); *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 379–80, 710 P.2d 1025, 1034–35 (1989); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 214–18, 765 P.2d 373, 376–79 (1988); *Johnson v. World Color Press,* 147 Ill. App.3d 746, 101 Ill.Dec. 251, 252–54, 498 N.E.2d 575, 576–78, *appeal denied,* 113 Ill.2d 575, 106 Ill.Dec. 47, 505 N.E.2d 353 (1966); *Delaney v. Taco Time Int'l,* 297 Or. 10, 681 P.2d 114, 118–19

(1984). Although these cases do not each contain all three steps used in this opinion, each does contain an analysis of all three elements in varying form.

12. Utah Code Ann. § 7–1–102(a) (emphasis added).

13. *Peterson,* 832 P.2d at 1282–1283 (Durham, J., joined by Howe, Assoc. C.J., and Stewart, J.), at 1287–1288 (Zimmerman, J., concurring in part, joined by Hall, C.J.).

Browning, argued for the one-time solution in OEC meetings, and mentioned the problem of the call reports to the Board.

■ We do not agree that plaintiff cannot meet a public policy requirement simply because he did not report the violation to the Attorney General or to the Commissioner. Plaintiff pursued all internal methods for resolving the problem; he need not have gone outside the Bank to try to correct the policy violation. Further, plaintiff presented evidence that he did speak to investigators in the Attorney General's office and that top management of the Bank became very angry when he did so. Therefore, plaintiff did present evidence that he furthered the public policy evidenced by the reporting requirements of the Act.

■ Third, we must determine whether plaintiff's acts in furtherance of the public policy were a substantial factor in his termination. Plaintiff presented evidence that his insistence on adhering to the Act created animosity toward him by management and certain members of the Board. The trial court, apparently relying on remoteness in time, found that this evidence did not support a claim that plaintiff's termination violated public policy and granted a directed verdict on that issue.

■ A trial court may properly grant a directed verdict only when reasonable minds would not differ on the facts to be determined from the evidence presented.[14] The trial court must assess those facts in a light most favorable to the party opposing the motion for directed verdict and must conclude, as a matter of law, that they do not support the claim presented. We do not agree with the trial court that reasonable minds could not differ on whether public policy was a substantial factor in Heslop's termination. While the question of causation in this case is close, we believe

that plaintiff presented enough evidence of resentment toward him as a result of his defense of public policy that the question of whether that policy was a substantial factor in his termination should have been presented to the jury for determination. We reverse the decision of the trial court granting a directed verdict to defendant on Heslop's public policy claims.

## V. EVIDENTIARY QUESTIONS

■ Defendant claims that the trial court erred in admitting evidence of the Bank's accrual problem, the wash entries made by Beutler, and the terminations of other Bank officers. Alternatively, defendant claims that the trial court erred in failing to instruct the jury that this evidence related only to the issue of good cause for termination. "In reviewing questions of admissibility of evidence at trial, deference is given to the trial court's advantageous position; thus, that court's rulings regarding admissibility will not be overturned 'unless it clearly appears that the lower court was in error.' " [15]

We find that the trial court did not abuse its discretion in admitting the evidence in question. Besides forming the basis for plaintiff's public policy claim, which the trial court had not yet dismissed,[16] the evidence related to the issues of just cause for termination and constructive discharge. The situation at the Bank as a whole was relevant to actions taken against Heslop, and the trial court properly received evidence of that situation.

## VI. SUFFICIENCY OF THE EVIDENCE

■ Defendant next claims that the trial court erred in denying its motion for judgment notwithstanding the verdict and

**14.** *Management Comm. of Graystone Pines Homeowner's Ass'n v. Graystone Pines, Inc.,* 652 P.2d 896, 897–98 (Utah 1982).

**15.** *Whitehead v. American Motors Sales Corp.,* 801 P.2d 920, 923 (Utah 1990) (quoting *State v. Gray,* 717 P.2d 1313, 1316 (Utah 1986)); *see also Bullock v. Ungricht,* 538 P.2d 190, 192 (Utah 1975).

**16.** At the time of the evidentiary rulings, the trial court had before it a public policy claim based in contract, which it later dismissed on directed verdict. We have since ruled that public policy was a proper issue to be put to the jury in this case. Therefore, the evidence was relevant.

its motion for new trial, both of which were based on insufficient evidence. When a party challenges a trial court's denial of a motion for a judgment notwithstanding the verdict or a new trial on appeal and bases that challenge on a claim that there was insufficient evidence to support the verdict, we follow one standard of review: We reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict.[17] When a challenge to the denial of either of these motions amounts to an attack on the sufficiency of the evidence, the appealing party "must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." [18]

■ In reviewing defendant's claims of insufficient evidence, we conclude that the Bank has not made the necessary showing. Although the Bank made an admirable listing of evidence presented in the case upon which the verdict was or could have been based, the Bank's arguments merely refute the credibility of this evidence and of Heslop as a witness. The Bank does not base its argument upon the insufficiency of the evidence supporting the verdict. Instead it relies on other, contradictory evidence that supports the Bank's position. The Bank also ignores the crucial testimony of Heslop that he was asked to resign and the letter he presented that tends to support his testimony. This type of argument, although based on the facts of the case, does not marshal the evidence and persuade us of its insufficiency. Absent a legal argument that Heslop's evidence fails to support a crucial element of his claims or that his evidence is inherently contradictory or incredible, we will not invade the province of jurors to determine Heslop's credibility

or to reverse their decision.[19] We find no error in the trial court's denial of the motions for a new trial or for a judgment notwithstanding the verdict.

## VII. IMPROPER ARGUMENTS OF COUNSEL

■ Defendant claims that the trial court erred in denying its motion for a new trial because of prejudicial arguments by Heslop's counsel during closing argument. Specifically, the Bank points to counsel's arguments that Bank officers violated the law and public policy by their resolution of the accrual problem and the fact that counsel misrepresented the testimony of Draughon, the Commissioner's examiner at the Bank. Counsel for Heslop stated in his closing argument:

And so Mr. Draughon's testimony, as I recall it, was what did you know about the accrual problem. And Browning responded with surprise. Mr. Kunz, when asked that question, provided a definite response that he did not know.

■ Draughon actually testified that he asked Browning and Kunz if they knew the extent of the accrual problem, not whether they claimed to know of it at all. However, the Bank did not object to this line of argument or to these statements at trial. Absent an objection by defendant, we will presume waiver of all arguments regarding the appropriateness of counsel's statements unless the error falls into the category of plain error.

■ To meet the criteria for application of the plain error doctrine, an error must be obvious and harmful.[20] The misstatement of Draughon's testimony in this case was not plain or obvious. In the course of a two-week trial, it is likely that counsel and the court will not flawlessly recall ev-

---

**17.** *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799–800 (Utah 1991); *King v. Fereday,* 739 P.2d 618, 620, 621 (Utah 1987); *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.,* 713 P.2d 55, 57–58 (Utah 1986).

**18.** *Crookston,* 817 P.2d at 799; *see also Price–Orem Inv. Co.,* 713 P.2d at 58; *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

**19.** *State v. Warden,* 813 P.2d 1146, 1150 (Utah 1991); *State v. Hopkins,* 782 P.2d 475, 477 (Utah 1989); *State v. Watts,* 675 P.2d 566, 568 (Utah 1983).

**20.** *State v. Anderson,* 789 P.2d 27, 28–29 (Utah 1990); *State v. Verde,* 770 P.2d 116, 121–22 (Utah 1989).

ery bit of evidence received. The distinction between Browning's and Kunz's knowledge of the accrual deficiency and what they told Draughon was testified to by several witnesses, including Draughon, Beutler, and Heslop. The mischaracterization of Draughon's testimony did not plainly misrepresent the facts of the case and would not add significantly to the jury's perception of the events.

Further, it appears that the objected-to statements were harmless and would have had little effect on the trial's outcome. The trial court did not abuse its discretion in denying a new trial based on these statements.

## VIII. IMPLIED COVENANT OF GOOD FAITH

■■■■ Plaintiff also appeals the trial court's grant of summary judgment to defendant and dismissal of plaintiff's claim for breach of an implied-in-law covenant of good faith and fair dealing. In *Loose v. Nature–All Corp.*[21] and *Brehany v. Nordstrom,*[22] we definitively refused to recognize an implied-in-law covenant of good faith that would replace the traditional at-will rule in employment cases. In *Brehany,* we stated that although every contract is subject to an implied covenant of good faith, that covenant cannot be construed "to establish new, independent rights or duties not agreed upon by the parties."[23] We also stated that an implied covenant of good faith cannot change an "indefinite-term, at-will employment contract into a contract that requires an employer to have good cause to justify a discharge."[24] We adhere to our holdings in these cases and affirm the decision of the trial court dismissing plaintiff's claim for breach of the covenant of good faith and fair dealing.

## IX. CONSEQUENTIAL DAMAGES

■■■■ Plaintiff next claims that the trial court erred in refusing his proposed jury instruction regarding an award of consequential damages, including attorney fees. In *Berube v. Fashion Centre Ltd.,* we stated that plaintiffs who prevail in employment cases may recover damages for general and consequential injuries resulting from the breach of an employment contract.[25] In holding that consequential damages would be available, we cited *Beck v. Farmers Insurance Exchange.*[26] In *Beck,* we allowed an insured to recover consequential damages for the breach of the covenant of good faith and fair dealing by an insurance company.[27]

*Beck* envisioned a broad range of recoverable damages for breach of the covenant of good faith and fair dealing in a first-party insurance contract. Similarly, *Berube* envisioned a broad range of recoverable damages in an implied-in-fact contract of employment, including both general and consequential damages. In *Berube,* we stated that "consequential damages are 'those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made.'"[28]

In *Canyon Country Store v. Bracey,*[29] this court interpreted consequential damages to allow attorney fees in a first-party insurance claim.[30] The rationale for allowing attorney fees as recoverable damages within the contemplation of the parties in first-party insurance claims is also applicable to employment claims. Terminated employees, like injured insurance claimants, find themselves in a particularly vulnerable position once the employer breaches the employment agreement. Employers can

21. 785 P.2d 1096, 1097–98 (Utah 1989).

22. 812 P.2d 49, 55 (Utah 1991).

23. *Id.*

24. *Id.*

25. *Berube,* 771 P.2d at 1050 (Durham, J., joined by Stewart J.), at 1053 (Zimmerman, J., concurring).

26. 701 P.2d 795 (Utah 1985).

27. *Id.* at 801–02.

28. *Berube,* 771 P.2d at 1050 (quoting *Beck,* 701 P.2d at 801).

29. 781 P.2d 414 (Utah 1989).

30. *Id.* at 420.

reasonably foresee that wrongfully terminated employees will be forced to file suit to enforce their employment contracts and will foreseeably incur attorney fees. Under our holdings in *Berube* and *Beck,* therefore, the trial court erred in refusing to instruct the jury on the availability of consequential damages, including attorney fees, in plaintiff's employment suit.

## X. CONCLUSION

We affirm the jury verdict and the trial court's dismissal of plaintiff's claim for breach of the implied covenant of good faith and fair dealing, the denial of defendant's motions for new trial and for judgment notwithstanding the verdict, and the admission of evidence of the accrual problem and the Attorney General's investigation of defendant. We reverse the trial court's dismissal of plaintiff's public policy tort claim and refusal to instruct the jury on foreseeable consequential damages, including attorney fees. Remanded for further proceedings consistent with this opinion.

STEWART, DURHAM and ZIMMERMAN, JJ., and BILLINGS, Court of Appeals Judge, concur.

HOWE, Associate C.J., having disqualified himself, does not participate herein; BILLINGS, Court of Appeals Judge, sat.