41 F.3d 1516
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Dennis GRAFFI, Plaintiff/Appellant,
v.
UNISYS, a Delaware corporation, Defendant/Appellee.
 No. 93-4077.
 United States Court of Appeals, Tenth Circuit.
 Nov. 8, 1994.
 
 1
 Before MOORE and SETH, Circuit Judges, and DAUGHERTY, District Judge.*
 
 
 2
 ORDER AND JUDGMENT**
 
 DAUGHERTY
 I. BACKGROUND
 
 3
 This is an appeal from a final judgment of the United States District Court for the District of Utah.
 
 
 4
 The Plaintiff/Appellant Dennis Graffi was hired by the predecessor of the Defendant/Appellee Unisys Corporation in its Salt Lake City office on April 12, 1982.[1] He was originally hired in the position of Supervisor of Physical Security, and later served in the positions of Manager of Physical Security and Manager of Communications Security. Prior to his employment with Defendant Unisys, Plaintiff Graffi had obtained a top-secret security clearance that allowed him to work on classified government programs, and the Plaintiff worked on such classified programs during his employment with Unisys. Plaintiff Graffi was involuntarily terminated from his employment with Defendant Unisys on June 27, 1988.
 
 
 5
 It is undisputed that Plaintiff Graffi had no written employment contract with either Defendant Unisys or its predecessor, Sperry-Univac. The Plaintiff, however, contends that because of his position and level of employment with Unisys, he could not be terminated without approval from corporate headquarters in McLean, Virginia. During the term of his employment with Defendant Unisys and its predecessor, Sperry-Univac, the Plaintiff was provided with two booklets relevant to his employment with the companies. The first booklet was given to Graffi when he commenced his employment with Sperry-Univac and was entitled "Your Company and You." That employee handbook provided in pertinent part as follows:
 
 
 6
 "Your Company and You" is intended to be a convenient and helpful source of information about important personnel practices ... Neither this handbook nor the maintenance of supervisory policies and procedures shall be construed as constituting a contract of employment, either express or implied.
 
 
 7
 The handbook then provided in a separate section entitled "Employment Relationship" that:
 
 
 8
 It is intended that the relationship between Unisys and its employees will grow and be in the best interests of both the employee and Unisys. However, it must be recognized that neither the offer and acceptance of employment or Unisys' establishment and maintenance of operating policies and procedures for guidance to managers creates a contract of employment except as such might be approved in writing by the Unisys chairman of the board of directors. It is timely, therefore, to restate your existing employment relationship as follows:
 
 
 9
 All employees are employed in an 'at-will' capacity, which means that either the employee or the Company may terminate the relationship at anytime with the understanding that neither party has the obligation to base that decision on any reason other than their intent not to continue the employment relationship.
 
 
 10
 Appellant's Appendix at 161.
 
 
 11
 The Plaintiff contends that regardless of the fact that he had no written contract with the Defendant company and despite the express language in the employee handbook concerning at-will employment, he nonetheless had an agreement with Unisys modifying his employee at-will status. Graffi contends that he was assured on at least ten occasions that his job was secure and that he had a "great future" with the Defendant company. Appellant's Appendix at 356-360. In this connection, the Plaintiff asserts that his top-secret security clearance made him especially valuable, for the reason that the company was required to expend both time and money to obtain such clearances on behalf of its employees.
 
 
 12
 The second booklet memorialized Defendant Unisys's adoption of a Code of Ethical Conduct in 1987 which required the employees to, among other requirements, report any suspected violations of the eithical code. The "Code of Ethical Conduct" booklet published by the company assured the employee that no adverse employment action would be taken against the employee as a result of making a "whistle-blowing" report. Plaintiff Graffi contends that the new Code of Ethical Conduct changed the employment relationship between the company and its employees for the reason that it established policies governing the relationships of company employees to each other and to the company's customers.
 
 
 13
 Subsequent to the adoption of the Code of Ethical Conduct, the Plaintiff asserts that he decided to report certain ethical violations that had allegedly been committed by some of his supervisors. He determined that it would be appropriate to contact someone outside of his Salt Lake City office and reported the violations to Ronald Terpak, a vice president in the defense division organization on May 26, 1988. These alleged ethical violations consisted of such problems as employees working less than their assigned number of hours, violations of the two-person rule, which required certain tasks to always be performed by two individuals in order that security might be maintained, and the alleged incompetence of John Condas, the acting security manager at Salt Lake City and Plaintiff Graffi's superior. Appellant's Appendix at 251-253, 374-5, 578. Certain anonymous letters were also received by the company concerning the activities of Graffi's immediate supervisor, Arthur Lujan.
 
 
 14
 In response to Graffi's phone call, the director of security for the defense division of Unisys was sent in June 1988 to Salt Lake City to investigate the charges made by Graffi, primarily the allegations concerning the competency of John Condas. According to the testimony of the director of security, Graffi's supervisors in Salt Lake City, Arthur Lujan and Harry Bolam, suspected that Graffi had both made the phone call to Terpak and wrote the anonymous letters, and were convinced that Graffi should be fired as a result. Appellant's Appendix at 425.
 
 
 15
 Arthur Lujan testified at trial that certain plans were made to effectuate the termination of Dennis Graffi in light of what was viewed as Graffi's attempt to undermine his superior's authority. The primary plan involved Graffi's transfer to the position of Manager of Communication Security. While Graffi was qualified as a result of his security clearances to become Manager of Communication Security, Lujan was convinced that Graffi would never accept such reassignment, as his entire career had been in physical security. If such lateral transfer was refused, Lujan and Bolam, after consultation with the company's department of human resources, determined that termination of Graffi would then be appropriate. However, when the change in position was proposed to Graffi, he accepted the transfer. The second plan involved Graffi's wife, also an employee at Unisys, but such plan was never acted upon. Appellant's Appendix at 432.
 
 
 16
 It was ultimately determined in June 1988 that Dennis Graffi should be terminated. The primary ground for such decision to terminate was Graffi's alleged relationship with the company CPP Pinkerton and its local representative in Salt Lake City, Peter Laub. Graffi's supervisors contended that Laub had accused Graffi of pressuring Laub to hire a certain individual to work on the CPP Pinkerton contract with Defendant Unisys, and had told Laub that such contract would be in jeopardy if that individual was not hired. Two letters were apparently prepared in connection with the CPP Pinkerton matter, both ostensibly signed by Peter Laub. The first letter, dated June 22, 1988, states only that Graffi had recommended an individual for the job at Pinkerton. The second letter, dated the same date, stated that Graffi "kept the pressure up" to hire the individual in question and allegedly told Peter Laub that if he did not do so, "we might lose the contract for Unisys." Appellant's Appendix at 495.
 
 
 17
 At trial, both Graffi and Laub contended that the second letter was not prepared by Laub as asserted by Defendant Unisys. Laub describes the second letter as "forged," Appellant's Appendix at 483-484, and contended that Graffi never applied undue pressure on him to hire anyone for the Unisys contract. The Plaintiff also presented a handwriting expert at trial who opined that Peter Laub's signature on the second letter was made by tracing the legitimate signature on the first letter. Appellant's Appendix at 529-530.
 
 
 18
 However, there was also testimony at trial from the retired head of the FBI's investigation section to the effect that ten fingerprints belonging to Laub were found on the disputed letter, six of those in the vicinity of the signature. The fingerprint expert testified that in his opinion the fingerprints around the signature were consistent with the writer of the letter steadying the letter with one hand while writing or tracing the signature with the other. Appellee's Appendix at 1483. The fingerprint expert also testified that two of the other fingerprints on the disputed letter belonged to Unisys employee John Condas, who in turn asserted that he had obtained the letter from Peter Laub at Laub's office.
 
 
 19
 Only the allegedly forged letter was sent to Unisys corporate headquarters in McLean, Virginia, to support the termination of Graffi. While the Director of Employee Relations, Marcella Graffin, testified that knowledge of such alleged forgery might have made a difference in the termination decision if such forgery were clearly established, she stated that she believed that there was "information that it is not a forged document" and further stated that "there was more than one reason that we were discussing the termination of Dennis Graffi even early on in the discussions ..." Appellant's Appendix at 662. As stated above, Plaintiff Graffi's termination was approved effective June 27, 1988.
 
 
 20
 The Plaintiff filed his Complaint in the United States District Court for the District of Utah, Central Division, based on diversity jurisdiction, on June 26, 1989, in which he sought to recover breach of contract and tort damages for wrongful termination of his employment. Graffi's contract action was based upon his claim that his termination violated his implied-in-fact agreement with Defendant Unisys not to be terminated without good cause. Graffi's tort claim was based upon the contention that Unisys knowingly violated the public policy of the State of Utah in connection with his termination through the use of the allegedly forged letter of Peter Laub.
 
 
 21
 At the conclusion of the Plaintiff's evidence and upon motion of the Defendant, the trial court ruled as a matter of law that the Plaintiff was an employee at-will and no implied promise had been made by the Defendant to terminate the Plaintiff only for good cause. The trial court also dismissed the Plaintiff's claim for violation of public policy as a matter of law, finding that the facts presented by the Plaintiff failed to meet the standards required by Utah law, and that no jury could reasonably find from the facts presented that the Plaintiff "was discharged for a reason or in a manner that contravenes sound principles of established and substantial public policy." Appellant's Appendix at 686.
 
 
 22
 The Court then sent the remainder of the case to the jury to decide whether
 
 
 23
 by sending out its ethics booklet and ethics procedures to the employees, Unisys had a contractual obligation to its employees, including Mr. Graffi, not to terminate him because he reported suspected ethical violations or other irregularities ... The two questions are if there was a contract implied-in-fact and, secondly, if Unisys fired Mr. Graffi for reporting these ethical violations. Appellant's Appendix at 688-689.
 
 
 24
 The jury concluded that the Code of Ethical Conduct gave rise to an implied contract on the whistle-blowing issue, but also decided that Graffi was not terminated solely for reporting violations of the ethical standards. Judgment was entered in favor of the Defendant and this appeal followed.
 
 II. DISCUSSION
 
 25
 The Plaintiff/Appellant raises three issues on appeal. Graffi first claims that the trial court erroneously dismissed the major part of his contract claim for wrongful discharge and improperly restricted that claim to a violation of the Defendant Unisys' "Code of Ethical Conduct." In reviewing a directed verdict, we must determine whether the evidence is so one-sided that one party should prevail as a matter of law. We examine the relevant evidence in the light most favorable to the Plaintiff and evaluate whether there is a reasonable basis in the evidence and the inferences to be drawn therefrom that might support a judgment in favor of the Plaintiff. Q.E.R., Inc. v. Hickerman, 880 F.2d 1178 (10th Cir.1989). Applying this standard to the facts of the case at bar, we agree with the trial court's decision on this issue and affirm.
 
 
 26
 It is clear that "[i]n Utah, an employee hired for an indefinite period is presumed to be an employee at-will who can be terminated for any reason whatsoever so long as the termination does not violate a state or federal statute." Johnson v. Morton Thiokol, Inc., 818 P.2d 997, 1000 (Utah 1991), citing Rose v. Allied Development Co., 719 P.2d 83, 84-85 (Utah 1986). See also, Berube v. Fashion Centre Ltd., 771 P.2d 1033 (Utah 1989). The Utah Supreme Court in Johnson went on to state that
 
 
 27
 the employee has the burden of establishing the existence of an implied-in-fact contract provision, that is, the employee must show that although there was no express contract provision to this effect, the parties nevertheless agreed that the employment would not be at-will ... The existence of an agreement is a question of fact which turns on the objective manifestations of the parties' intent. As a question of fact, the intent of the parties is primarily a jury question. However, if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide this issue as a matter of law.
 
 
 28
 Johnson v. Morton Thiokol, Inc., 818 P.2d at 1001.
 
 
 29
 The evidence considered in determining whether an implied-in-fact contract exists may include employment manuals and bulletins containing policies for employee termination, but is not to be limited to these items. Brehany v. Nordstrom, Inc., 818 P.2d 49 (Utah 1991).
 
 
 30
 Plaintiff Graffi relies on several sources, both written and oral, to rebut the presumption that his employment was at-will and establish the implied-in-fact contract term. The first of these sources is conversations with Graffi's supervisors in which Graffi asserts that he was assured that he would always have a position with Defendant Unisys if he so desired. Graffi testified that Bolam made such statements to him as "you have a great future with our company" and "[w]e make a great team and you have a job here as long as you want it." Appellant's Appendix at 215-16.
 
 
 31
 Graffi asserted at trial that these conversations took place on at least ten occasions, but in his testimony during the trial he only testified specifically as to two of those ten incidents and then stated that "[f]rom then on I really don't have any specifics." Graffi's testimony on this issue continued as follows:
 
 
 32
 Again, a lot of times it would be more of a joking thing. When I would come back from a class, the first thing I would always tell him (Bolam) was that I had some job offers when I was back there because of my clearances and the need for clearances. And he would generally say, 'I hope you're not planning on leaving, you can stay here as long as you want. We have an opening for you.' Appellant's Appendix at 217.
 
 
 33
 The district court found that "there are simply not enough facts" to support the Plaintiff's argument that the statements made by Bolam are sufficient to rebut the presumption of at-will employment. We agree, especially given the unusually clear and explicit language in the employer handbook concerning the employee's at-will status with the company.[2]
 
 
 34
 The context in which the statements of Bolam relied on by the Plaintiff were made clearly indicate that any assurances were in response to the Plaintiff's comments concerning other offers of employment and were considered even by the Plaintiff to be largely "joking." Any statements made in a more serious vein are properly considered as coming only from Bolam himself without authority from the Chairman of the Board of Unisys, which the employee handbook explicitly requires in order that a contract of employment be valid. It is apparent from the trial testimony that Bolam was merely indicating his pleasure with certain accomplishments of Graffi, and any statements concerning continued employment should be evaluated on that basis. At best, Bolam's statements could be interpreted as a promise that Graffi would have a job with Unisys as long as Bolam was his supervisor.[3]
 
 
 35
 When the alleged promises made by Graffi's supervisor Bolam are compared with the assurances given in the recent Utah case of Sanderson v. First Security Leasing Company, 844 P.2d 303 (Utah 1992), the flaws in the Plaintiff's argument in this regard are readily apparent. In Sanderson, the Plaintiff became quite ill and was concerned that such illness would cost him his job. Plaintiff Sanderson testified that the company president assured him that he would not be terminated as a result of the illness, and that his job would be there when he was ready to come back. Plaintiff Sanderson also asserted that the company's termination procedures handbook created an implied-in-fact contract sufficient to overcome the presumption of employment at-will, and that the company violated the implied covenant of good faith and fair dealing.
 
 
 36
 The Utah Supreme Court affirmed the trial court's grant of summary judgment in favor of the defendant company as to the termination procedures handbook and the implied covenant of good faith and fair dealing, for the reason that the company had reserved "unbounded discretion to discharge employees" in the termination procedures handbook. Sanderson, 844 P.2d at 306. As to the claimed oral assurances made by the company president, the Supreme Court reversed the trial court's grant of summary judgment in favor of the Defendant and stated that
 
 
 37
 If the situation unfolded as Sanderson has described it and if the statements made were clear and unequivocal, a reasonable jury could find that they modified the express at-will terms of the employee manual regarding causes for discharge and constituted an explicit enforceable term not to fire Sanderson because of his illness-induced absenteeism. A jury could find that, contrary to [the company's] characterization, the statements as recounted by Sanderson were neither vague encouragement nor hyperbolic optimism because they conveyed [the company president's] clear and unequivocal intention to relinquish his right to fire Sanderson because he had missed so much work.
 
 
 38
 Sanderson, 844 P.2d at 307.
 
 
 39
 In remanding this issue for trial, the Supreme Court stressed the narrowness of the Sanderson holding and emphasized that the president of the company "retained his at-will prerogative to fire Sanderson at any time for any other reason" except possibly Sanderson's illness. Sanderson, 844 P.2d at 307.
 
 
 40
 In contrast with Sanderson, in the case at bar the individual making the alleged promises was not the company president and, according to the employee handbook which had been given to all employees including Plaintiff Graffi, did not have the authority to make such an implied contract on behalf of Defendant Unisys. In addition, given the circumstances surrounding Supervisor Bolam's statements, such statements could best be described as "hyperbolic optimism" with no basis to render such statements otherwise believable. The trial court's determination that such assurances were insufficient as a matter of law to overcome the presumption of at-will employment was correct and should be affirmed.
 
 
 41
 Plaintiff/Appellant Graffi next asserts that his top secret security clearance gave him job security with Defendant Unisys. Graffi contends that Unisys was concerned about the high cost and the amount of time required for employees to obtain top secret clearances. He contends that he was much more valuable to the company as a result of such clearance, in that he was immediately available to work on classified programs.
 
 
 42
 While all of the above may be true, and in fact Defendant Unisys acknowledges that employees with security clearances were more valuable to the company than those without, this in no way impacts upon the unqualified right of Defendant Unisys to terminate such employees at-will. Unisys may be more reluctant to terminate an employee with a security clearance than one without given the factors involved, but it simply does not follow that the company's right to do so is somehow restricted as a result of an employee obtaining such a security clearance. Plaintiff Graffi's argument on this issue is without merit.
 
 
 43
 Lastly, Graffi asserts that it was the policy and practice of the company to terminate an employee only for good cause, and points to the trial testimony concerning the plans devised to effectuate his termination as evidence of the company's policies in this regard. Graffi contends that his termination did not meet the good cause standard set by the company, for the reason that he asserts that such termination was primarily based on the allegedly forged letter of Peter Laub.
 
 
 44
 As the Utah Supreme Court stated in Johnson v. Morton Thiokol, in which case the company had actually published a booklet of termination procedures, "the procedures in the handbook for terminating an employee must be read in light of the language in the disclaimer which clearly reserved the right to discharge for any reason. Under such an approach, the most [the plaintiff] is entitled to is the right to challenge his termination under the handbook's procedures, not the right to be fired only for good cause." Johnson, 818 P.2d at 1003.
 
 
 45
 In his brief in support of his appeal on this issue, Plaintiff Graffi does not seem to dispute that any internal company procedures regarding termination were followed in his case. Rather, Graffi asserts that the company did not have good cause for his termination. As the above quote from the Johnson case makes abundantly clear, however, good cause is not required, and thus the Plaintiff's position on this issue is completely without merit. In addition, a review of the trial testimony indicates that whatever termination review procedures the company may have had in place were in fact followed in the case at bar. The Director of Employee Relations and Benefits for Unisys, Marcella Graffin, testified that there was a meeting to discuss the proposed termination of Dennis Graffi on June 6, 1988. That meeting was attended by Bolam and an attorney for Unisys. Marcella Graffin stated at trial that termination approval was not given during that meeting because the termination involved "a lot longer process" than just one meeting. Graffin went on to testify that, after investigation, such approval was ultimately given.
 
 
 46
 In addition, there was testimony from George Entwistle, the Group Manager of Human Resources for Defendant Unisys, concerning the investigation into the alleged misconduct of Dennis Graffi prior to his termination. Entwistle testified that he was in touch with the Employee Relations Manager at Salt Lake City on a several-times-a-day basis after the investigation into the complaints against Dennis Graffi began. Entwistle testified that the employee relations manager "reported to me on a periodic basis, certainly daily, probably much more frequently than daily, as she interviews or she and her staff interview people, and she is feeding that information back to me and I am compiling that information until we reach a point where ... the investigation was concluded or the determination was made that this is a problem that we need to take care of right now." Appellee's Supplemental Appendix at 585. In light of the foregoing, this Court is convinced that all procedures that may have been necessary prior to the termination of Graffi as a result of the company policy of Defendant Unisys were followed in this case, and Graffi's complaints in this regard are without merit.
 
 
 47
 The Plaintiff's second contention on appeal is that the trial court erred in dismissing the Plaintiff's tort claim for violation of public policy. We review the trial court's decision under the same standard used in our review of the first proposition on appeal; that is, whether the evidence presented is so one-sided that one party should prevail as a matter of law. Q.E.R. v. Hickerman, 880 F.2d 1178 (10th Cir.1989). Again, we are of the opinion that the decision of the trial court on this issue was correct and we affirm.
 
 
 48
 The standard for the examination of a public policy claim under Utah law was set forth by the Utah Supreme Court in the recent case of Heslop v. Bank of Utah, 839 P.2d 828 (Utah 1992). In that case, the Supreme Court stated that review of a public policy claim such as that made by the Plaintiff
 
 
 49
 generally poses three questions: (1) Does the Plaintiff's termination implicate a clear and substantial public policy? (2) Did the employer violate this policy by requiring the employee to engage in conduct violating the policy or by punishing conduct furthering the policy? (3) Was violation of this policy a substantial factor in the Plaintiff's termination?
 
 
 50
 Heslop, 839 P.2d at 837.
 
 
 51
 A review of the Utah Supreme Court's discussion of the above factors indicates that the factors should be considered in the conjunctive and thus all three must be met before a violation of public policy will be found.
 
 
 52
 The Plaintiff in the case at bar bases his public policy claim on the use of the allegedly forged Laub letter in his termination. The Plaintiff asserts that the evidence at trial clearly established that the second Laub letter must have been prepared by Unisys employees at the Salt Lake City office. The Plaintiff contends that in forging the letter, the employees violated a criminal statute making forgery unlawful in the State of Utah, U.C.A. 76-6-501, and further violated Utah public policy in using the forged letter to bring about Plaintiff Graffi's termination.
 
 
 53
 We are of the opinion that the Plaintiff has erred in his analysis of the Heslop factors. Even if this Court should determine that the first question posed in the Heslop analysis--does the Plaintiff's termination implicate a clear and substantial public policy--should be answered in the affirmative, it is apparent that the second prong of the Heslop analysis is not met in the case at bar. As stated above, the second Heslop factor requires an analysis of whether the employer violated public policy by "requiring the employee to engage in conduct violating the policy or by punishing conduct furthering the policy." Heslop, 839 P.2d at 837. In ruling in favor of Plaintiff Heslop on this issue, the Utah Supreme Court stated that
 
 
 54
 We now must determine whether Plaintiff acted in furtherance of or refused to violate those policies. Plaintiff did not present evidence that the bank required him to do anything prohibited by the Act. He did, however, present evidence that he vocally insisted on adherence to the Act by refusing to agree to a long-term solution to the accrual problem ...
 
 
 55
 Heslop, 839 P.2d at 837.
 
 
 56
 There is simply no indication in the case at bar that Defendant Unisys either attempted to coerce the Plaintiff into violating a public policy of Utah or punished any conduct of the Plaintiff in furtherance of such a public policy. The Plaintiff's only contention is that the Defendant used an allegedly forged letter to improperly establish cause for the Plaintiff's termination. Even if true, this does not, as the trial judge so found, meet the legal standard for a violation of public policy claim in Utah.[4] As a result, the decision of the trial judge on this issue should be affirmed.
 
 
 57
 Lastly, Plaintiff/Appellant Graffi argues on appeal that the trial judge erroneously excluded evidence of emotional damage during the trial. In light of our holding that the trial court properly restricted the Plaintiff's breach of contract claim to the Unisys Code of Ethical Conduct and the question of whether such Code created an implied contract on the part of the company not to fire an individual for whistle-blowing and because the jury returned a verdict against the Plaintiff on the question of whether he was in fact fired for whistle-blowing, we need not reach the issue of the Plaintiff's entitlement to emotional damages as a result of that claim.
 
 
 58
 AFFIRMED.
 
 
 
 *
 The Honorable Fred Daugherty, Senior United States District Judge for the Western, Eastern and Northern Districts of Oklahoma, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 The predecessor corporation that originally hired Plaintiff Graffi was Sperry-Univac. In 1986 the Burrows Corporation acquired Sperry-Univac and created Defendant Unisys Corporation. The Plaintiff became an employee of Unisys when that change took place
 
 
 [2]
 While the Plaintiff contends that the language in the handbook cannot be considered part of his employment contract because the handbook disclaims contractual status, such argument is irrelevant for the reason that Utah law establishes employment at-will as the contractual status in the absence of evidence to the contrary. The language in the handbook concerning employment at-will is an express statement of the existing status of the employment relationship under Utah law and, as such, does not need to be incorporated into a contractual agreement between the parties. See, Johnson v. Morton Thiokol, 818 P.2d 997 (Utah 1991)
 
 
 [3]
 Graffi's immediate supervisors were among several individuals fired in the summer of 1988 for securities violations
 
 
 [4]
 We note at this point that, although not necessary to our decision on this issue, we do not agree with the Plaintiff's claim that the evidence at trial clearly established the forgery of the second letter. It seems to us that there was at least an equal amount of evidence presented to conclude the second letter was in fact authored by Peter Laub